SUKETU H. NANAVATI, M.D., PLAINTIFF-APPELLANT, v. BURDETTE TOMLIN MEMORIAL HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT, AND MARVIN PODOLNICK, M.D., CARMEN ALAMENO, M.D., MARY ANN HAFLIN, M.D., MELVIN HANKIN, M.D., H. SEZER KOKNAR, M.D., AND RICHARD RENZA, D.O., EXECUTIVE COMMITTEE OF THE MEDICAL STAFF OF THE BURDETTE TOMLIN MEMORIAL HOSPITAL, DEFENDANTS.

Argued January 21, 1987—Decided June 16, 1987.

*Gerald W. Eisenstat* argued the cause for appellant (*Eisenstat, Gabage & Berman,* attorneys; *Gerald W. Eisenstat, Mitchell S. Berman,* and *Harry Furman,* on the briefs).

*Carl J. Valore* argued the cause for respondent (*Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz,* attorneys; *Carl J. Valore* and *Nina Wisznat Chase,* on the brief).

*Mary K. Brennan* submitted a brief on behalf of *amicus curiae,* New Jersey Hospital Association (*Brener, Wallack & Hill,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal arises out of the revocation of the staff privileges of Suketu H. Nanavati (Dr. Nanavati) as a cardiologist at Burdette Tomlin Memorial Hospital (the hospital). The Chancery Division found that the hospital had prejudged the matter, thereby depriving Dr. Nanavati of a fair hearing. After making independent findings of fact, the court permanently enjoined the revocation of Dr. Nanavati's privileges. In an unreported opinion, the Appellate Division affirmed the issuance of the injunction "without prejudice to the relodging of the charges against plaintiff." The court also determined that the trial court should not have made independent findings of fact and that the appropriate standard of review is whether the decision of the hospital was supported by sufficient credible evidence.

We granted Dr. Nanavati's petition for certification, 105 *N.J.* 512 (1986), and now modify and affirm the judgment of the Appellate Division by remanding the matter to the hospital with the understanding that within a reasonable time it may reinstitute the proceedings against Dr. Nanavati. The injunction is to remain in effect, pending the outcome of any such proceedings.

–I–

The background of this case is a dispute between Dr. Nanavati and Dr. Robert Sorensen, who at the time was the chief of cardiology, chairman of the Department of Medicine, and a member of the Board of Governors at the hospital. The dispute originated over the allocation of the reading of electrocardiograms (ECGs or EKGs), which, at $5 per reading, produced an annual income of approximately $75,000. Burdette Tomlin is the only hospital in Cape May County, and when he was granted staff privileges, Dr. Nanavati was the only board-certified cardiologist in the county. Before the arrival of Dr. Nanavati in 1979, Dr. Sorensen, an internist, enjoyed a virtual monopoly on reading ECGs. Dr. Nanavati was allowed to read ECGs one day each week, but when he requested an additional day, Dr. Sorensen rejected his request. The rejection stimulated Dr. Nanavati into criticizing Dr. Sorensen, who retaliated.

As the discord between the two doctors escalated, Dr. Nanavati allegedly committed a series of violations of the hospital's bylaws. On August 2, 1982, the medical staff executive committee "voted unanimously to act toward the revocation of Dr. Nanavati's medical staff privileges." That action marked the beginning of lengthy proceedings before the hospital authorities and before federal and state courts in this state.

Pursuant to the hospital bylaws, the chairman of the medical staff executive committee requested the hospital executive committee to take corrective action. The executive committee forwarded the request to the chief of the Department of Medicine, who appointed an ad hoc committee to investigate the matter. The charges against Dr. Nanavati were captioned as "Acts of Disruptive Behavior" and "Failure to Cooperate with Hospital Personnel Regarding the Use of Facilities Especially During the Summer Months and the Emergent Admissions Procedures."

Underlying these charges is the contention that Dr. Nanavati caused disruption in violation of a bylaw provision requiring a staff doctor to

be of a temperament and disposition that will enable him to work in harmony with his colleagues on the Medical Staff; with the professional, technical, and other personnel in the hospital, and with the administration, accepting criticism without resentment and offering it in a spirit and manner that is constructive and devoid of offense and malice * * *.

The further allegation is that Dr. Nanavati violated a bylaw provision that a staff member "must enjoy the reputation of being an ethical and conscientious practitioner and must strictly abide by the Code of Ethics * * *." At no time has the hospital questioned Dr. Nanavati's technical competence.

On August 23, 1982, the ad hoc committee "found against Dr. Nanavati on all charges and specifications" and recommended as the only appropriate punishment "his discharge from the Medical Staff of Burdette Tomlin Memorial Hospital, together with the permanent deprivation of Burdette Memorial Hospital privileges." The executive committee of the medical staff affirmed that finding, and Dr. Nanavati appealed to an ad hoc committee of the medical staff, which unanimously found against him and recommended that he be dismissed from the staff of the hospital. In November, the hospital administrator advised Dr. Nanavati of the revocation of his staff privileges.

Dr. Nanavati immediately filed an action in the Chancery Division, which found that the proceedings had not been conducted in accordance with the hospital's bylaws, enjoined the revocation of Dr. Nanavati's privileges, and remanded the matter for further proceedings to be conducted in accordance with the hospital's bylaws. The Board of Governors thereupon appointed a hearing committee, which recommended on April 15, 1983, "that the action of the medical staff in dismissing Dr. Nanavati be affirmed." Two weeks later, on April 29, the Board affirmed the hearing committee's recommendation.

Meanwhile, on March 8, 1983, Dr. Nanavati instituted an action in the United States District Court for the District of New Jersey against the hospital, the executive committee of the medical staff (both of which filed counterclaims against him), and Dr. Sorensen, who initiated an independent action against

Dr. Nanavati. The cases were consolidated for trial and resulted in the entry of a judgment on July 23, 1986, in favor of Dr. Nanavati on an anti-trust claim against the hospital in the amount of $350,000, which was trebled, pursuant to 15 *U.S.C.A.* § 15, for a total of $1,050,000. Dr. Sorensen recovered $100,-000 compensatory damages and $300,000 punitive damages against Dr. Nanavati on a claim for tortious interference with prospective economic advantage, and $100,000 as compensatory damages and $500,000 as punitive damages on a defamation claim. Likewise, the hospital recovered $100,000 compensatory damages and $50,000 punitive damages against Dr. Nanavati on its defamation claim. In effect, the jury returned a verdict both for and against Dr. Nanavati in the amount of $1,050,000. Under Federal Rule Civil Procedure 50(b), however, the trial court entered judgment notwithstanding the verdict in favor of the hospital and the executive committee, the effect of which was to vacate the $1,050,000 judgment recovered by Dr. Nanavati. 645 *F.Supp.* 1217 (D.N.J.1986), *appeal docketed*, No. 86–5778 (3d Cir. Nov. 5, 1986) & No. 86–5819 (3d Cir. Nov. 20, 1986). As a result, Dr. Nanavati is obligated to the hospital and Dr. Sorensen in the amount of $1,050,000. The matter is now on appeal before the Third Circuit. *Id.*

Returning to the present action, the Chancery Division found in July 1983 that the hearing committee, without notice to Dr. Nanavati, had held *ex parte* hearings, which "violated fundamental fairness," and again remanded the matter to the hospital. The hearing committee again recommended revocation of Dr. Nanavati's staff privileges, and the Board again approved the recommendation. Once again the Chancery Division found that the proceedings were unfair. The Appellate Division affirmed the Chancery Division's finding that Dr. Nanavati had been deprived of a fair hearing, and the hospital did not cross-petition for relief from the Appellate Division's judgment. Hence, we accept the judgment of the lower courts that Dr. Nanavati has never had a fair hearing on the revocation of his privileges. Suffice it to state that a hearing cannot be fair if

the hearing body prejudges the matter before the hearing begins.

After finding that the hospital proceedings were unfair, the Chancery Division independently reviewed the record by a preponderance-of-the-evidence standard. The court determined that Dr. Nanavati's staff privileges should not be revoked on the ground of disharmony, absent a showing of actual interference with patient care, and concluded that the record did not support any such showing. Consequently, the court issued a permanent injunction against revocation of his privileges.

Although the Appellate Division affirmed the trial court's finding that the hospital proceedings were invalid, it disagreed with other portions of the trial court's opinion and held that the trial court, in reviewing the revocation of hospital staff privileges, should not have made independent findings of fact, but should have determined whether the hospital's decision was supported by sufficient credible evidence. In addition, the Appellate Division ruled that mere disharmony, although an insufficient ground by itself, is a relevant consideration in revocation proceedings.

With specific reference to the charges against Dr. Nanavati, the Appellate Division stated:

> Unfair criticism tending to break down nursing staff morale and discipline, inquiry to a patient as to why she had chosen another doctor and preemption of hospital beds contrary to admissions policy were among defendant hospital's charges against plaintiff. In our view, none of the foregoing charges, as examples of the fifteen charges against plaintiff, were petty personality grievances or inadmissible against plaintiff in hospital disciplinary proceedings until proof of actual adverse effect on patient care.

Nonetheless, the court declined to pass upon the charges against plaintiff, which it held to "remain open and unresolved." It sustained the issuance of the injunction and ruled that

> [i]f the charges are relodged, plaintiff would be entitled to a fair hearing *de novo* before an impartial tribunal acting in good faith. He may move before the trial court upon a showing of continuing prejudice against him for transfer of such proceeding from defendant hospital to an appropriate alternate forum,

which may be a master appointed by the trial court, the trial court itself in a plenary hearing, or such alternate forum as the parties may agree to.

We granted Dr. Nanavati's petition for certification to determine the appropriate standard of review of the decision by a hospital to terminate a physician's staff privileges and to determine further whether actual interference with patient care is required in order to terminate those privileges.

–II–

■ Hospitals exist to provide health care to the public. In addition to serving the needs of their patients, hospitals also provide a place of employment for doctors and other professionals. The privilege to admit and treat patients at a hospital can be critical to a doctor's ability to practice his profession and to treat patients. Both doctors and their patients can suffer if otherwise qualified doctors are wrongly denied staff privileges. Hence, we have not hesitated to invalidate unreasonable restrictions on staff privileges. *See Berman v. Valley Hosp.*, 103 *N.J.* 100, 106–07 (1986); *Desai v. St. Barnabas Medical Center*, 103 *N.J.* 79, 90–91 (1986); *Greisman v. Newcomb Hosp.*, 40 *N.J.* 389, 404 (1963). Furthermore, hospitals must follow fair procedures when considering staff privileges, and may not arbitrarily foreclose otherwise qualified doctors from their staffs. *Belmar v. Cipolla*, 96 *N.J.* 199, 207–08 (1984).

■ Twenty-five years ago we rejected the notion that decisions of private hospitals concerning staff privileges were beyond judicial review. *Greisman v. Newcomb Hosp., supra*, 40 *N.J.* at 395–96. By analogy to private businesses affected by the public interest, *id.* at 397, we ruled that courts should intervene when a hospital denied staff membership "for a reason unrelated to sound hospital standards and in furtherance of the common good," *id.* at 404. In reaching that conclusion, we also declared that "reasonable and constructive exercises of judgment should be honored * * *." *Id.* Just last year, we further relaxed the test for judicial review and stated that courts should not interfere with a hospital decision setting

a standard for admission "if it is reached in the normal and regular course of conducting the affairs of the hospital and is based on adequate information, regardless of form, origin, or authorship, that is generally considered feasible and reliable by professional persons responsibly involved in the health care field." *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 93. Thus, courts should sustain a hospital's standard for granting staff privileges if that standard is rationally related to the delivery of health care. A decision is so related if it advances the interests of the public, particularly patients; the hospital; or those who are essential to the hospital's operations, such as doctors and nurses.

Although not quite so deferential when reviewing decisions denying staff privileges, courts still apply a relaxed standard of review to those decisions. *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 92. The test for judicial review of such a decision is whether it is supported by "sufficient reliable evidence, even though of a hearsay nature, to justify the result." *Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 *N.J.* 549, 565 (1979).

█ We have previously explained the difference between the two tests by analogy to judicial review of administrative actions. *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 92–93. Setting a standard for admission to staff privileges is roughly analogous to the kind of policy decision reflected in administrative rulemaking. *Berman v. Valley Hosp., supra,* 103 *N.J.* at 107. Carrying forward the analogy, a hospital's use of that standard to decide a particular case is like quasi-judicial agency action. *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 92. Nonetheless, a more relaxed standard of review applies to the decisions of a hospital than to those of an administrative agency. To pass judicial review, the decision of an administrative agency must be supported by substantial credible evidence, but the decision of a hospital need be supported only by sufficient reliable evidence. *Id.* Underlying the more relaxed standard is our growing awareness that courts

should allow hospitals, as long as they proceed fairly, to run their own business. That sense is tempered by the recognition that doctors need staff privileges to serve their patients, and that the public interest requires that hospitals treat doctors fairly in making decisions about those privileges. Notwithstanding our more indulgent review of hospital decisions, a decision denying or revoking staff privileges merits a closer look than a decision setting the standard for the determination of those privileges.

In prior cases, we have considered the denial of privileges to new applicants. *See Berman v. Valley Hosp., supra,* 103 *N.J.* 100; *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* 79; *Garrow v. Elizabeth Gen. Hosp. & Dispensary, supra,* 79 *N.J.* 549; *Greisman v. Newcomb Hosp., supra,* 40 *N.J.* 389. Although we have not previously decided a case involving the revocation of privileges, the Chancery Division has sustained the termination of the participation of two oral surgeons in the rotation schedule of a hospital. *Grodjesk v. Jersey City Medical Center,* 135 *N.J.Super.* 393 (1975). As important as a decision denying staff privileges may be to a new applicant, a decision revoking those privileges is even more important to a physician with an established practice. M. Macdonald, K. Meyer, & B. Essig, *Health Care Law: A Practical Guide* § 15.04[3] at 15–37 (1986) (*Health Care Law*). Both that physician and his or her patients have more at stake in a decision affecting staff privileges. For the hospital, too, the revocation of a doctor's privileges may be more important than their denial. A doctor who is already on the hospital staff is in a position to injure patients by disrupting the operation of the hospital. Thus, the stakes are higher for all concerned when the issue is the revocation, not the denial, of staff privileges. Nonetheless, the standard of judicial review should remain the same. *See Health Care Law, supra,* § 15.04[3] at 15–36.

Several factors underlie our deference to the decisions of a hospital pertaining to staff privileges. As here, most hospitals

have established procedures to make and review decisions affecting those privileges. The purpose of such a procedure is to provide, outside of the judicial system, a fair method for making decisions concerning staff privileges. A second consideration is that hospitals are subject to extensive regulation, including regulations requiring the board of directors to appoint and oversee a qualified medical staff. *N.J.A.C.* 8:43B–2.1(a)(5); *Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 88–90. Finally, governing a hospital requires expertise in both medical treatment and hospital administration. *See Belmar v. Cipolla, supra,* 96 *N.J.* at 207. In so specialized and sensitive an activity as governing a hospital, courts are well advised to defer to those with the duty to govern. Courts in other states also have employed a relaxed standard of review in cases involving staff privileges. *See, e.g., Miller v. National Medical Hosp. of Montgomery Park, Inc.,* 124 *Cal.App.*3d 81, 84, 177 *Cal.Rptr.* 119, 121 (1981) (hospital board's findings must be supported by "substantial evidence in light of the whole record"); *Bricker v. Sceva,* 111 *N.H.* 276, 279, 281 *A.*2d 589, 592, *cert. denied,* 404 *U.S.* 995, 92 *S.Ct.* 535, 30 *L.Ed.*2d 547 (1971) (hospital board must make an "intelligent and reasonable judgment in good faith") (quoting *Sussman v. Overlook Hosp. Ass'n,* 95 *N.J.Super.* 418, 425 (App.Div.1967)); *Huffaker v. Bailey,* 273 *Or.* 273, 276, 540 *P.*2d 1398, 1401 (1975) (decisions of board are not overruled as long as made in "good faith and supported by an adequate factual basis"); *see also Silver v. Castle Memorial Hosp.,* 53 *Hawaii* 475, 480, 497 *P.*2d 564, 568, *cert. denied,* 409 *U.S.* 1048, 93 *S.Ct.* 517, 34 *L.Ed.*2d 500 (1972) (judicial review is available as to whether hospital board's decision has resulted in an arbitrary, capricious or unreasonable exclusion); *Kiracofe v. Reid Memorial Hosp.,* 461 *N.E.*2d 1134, 1140–41 (Ind.App.1984) (hospital decision concerning staff privileges is accorded great deference and judicial review is limited to whether procedures employed are fair, standards set by hospital are fair, and standards are applied

with arbitrariness or capriciousness); *Miller v. Indiana Hosp.*, 277 *Pa.Super.* 370, 375, 419 *A.*2d 1191, 1194 (1980) (rules of evidence need not be so stringently applied in hearing before hospital committee as they are in trial); Note, *Hospital Staff Privileges: The Need for Legislation*, 17 *Stan.L.Rev.* 900, 924 (*Hospital Staff Privileges* ) ("it would seem desirable to limit the court to the 'substantial evidence' rule").

Although they experience many of the problems of other corporations, hospitals differ in that they are vitally affected with a public interest and regularly function in a crisis atmosphere. Emergencies arise not only in emergency rooms, but throughout the hospital: in intensive care units, operating rooms, and patient rooms. In so intense a setting, flaring tempers, harsh words, and bruised feelings are to be expected. Nonetheless, if a hospital is to care for its patients, the staff, particularly doctors and nurses, must work together. *Health Care Law, supra,* § 15.04[2][c] at 15–29 (quoting *Huffaker v. Bailey, supra,* 540 *P.*2d at 1400). As important as cooperation is to other corporations, it is even more critical in a modern hospital, where no single doctor cares for all the needs of any one patient. Hospital doctors depend on their colleagues, nurses, technicians, and other employees for total patient care. Just how to bring about the necessary cooperation among them is a matter best left to hospital authorities: the medical staff, hospital committees, and the governing body.

█ Membership on a medical staff can have a direct effect on the treatment of patients. *Berman v. Valley Hosp., supra,* 103 *N.J.* at 106. In evaluating a physician for staff membership, a hospital may consider not only his or her technical skills, but also his or her ability to work with others. *Health Care Law, supra,* § 15.04[2][c] at 15–29; *Hospital Staff Privileges, supra,* at 905. Consequently, a hospital may adopt a bylaw providing that the inability of a doctor to work with nurses and other doctors is a ground for denying or terminating staff privileges. *See Sussman v. Overlook Hosp. Ass'n,* 92 *N.J.Super.* 163, 180–82 (Ch.Div.1966), *aff'd,* 95 *N.J.Super.* 418 (App.

Div.1967); *Grodjesk v. Jersey City Medical Center, supra,* 135 *N.J.Super.* at 408, 409–10.

▮ Doctors, like other people, have quirks, and some doctors are more disagreeable than others. The mere fact that a doctor is irascible, however, does not constitute good cause for termination of his or her hospital privileges. *McElhinney v. William Booth Memorial Hosp.,* 544 *S.W.*2d 216, 218 (Ky. 1977). Nor should allegations of "disharmony" ever be used as a ruse to deny or terminate staff privileges because of a doctor's race, religion, color, or gender. Likewise, a doctor should not be cut off from staff membership merely because he or she has criticized hospital practices and other doctors. *See Sussman v. Overlook Hosp. Ass'n, supra,* 95 *N.J.Super.* at 424 (valid and constructive criticism of hospital practices should not be equated with potential disharmony); *Health Care Law, supra,* § 15.04[2][c] at 15–30. Constructive criticism of an incompetent physician, like criticism of an unsafe or inefficient hospital practice, protects both the public and the hospital. So strong is the public interest in open communication involving "matters directly affecting the quality of health care" that otherwise defamatory statements by one staff physician about another may be privileged. *Bainhauer v. Manoukian,* 215 *N.J.Super.* 9, 38 (App.Div.1987). Some statements by one doctor about another, however, are not privileged and, depending on the circumstances, even non-defamatory statements can adversely affect the cooperation that is essential for the treatment of hospital patients. The right to criticize constructively is not a right to malign. *Sussman v. Overlook Hosp. Ass'n, supra,* 95 *N.J.Super.* at 425.

▮ When a doctor's conduct actually interferes with patient care, the disruption justifies ending his or her privileges. *Straube v. Emanuel Lutheran Charity Bd.,* 287 *Or.* 375, 384, 600 *P.*2d 381, 387 (1979), *cert. denied,* 445 *U.S.* 966, 100 *S.Ct.* 1657, 64 *L.Ed.*2d 242 (1980) ("physician's inability to work with others that jeopardizes patient care is good cause for terminating his staff privileges"); *see also Even v. Longmont*

*United Hosp. Ass'n,* 629 *P.*2d 1100, 1102 (Colo.App.1981) (hospital properly terminated physician's privileges based upon his "unprofessional conduct * * * [that] disrupt[ed] the normal functioning [of the hospital] * * * with real and potential danger to the care of patients in the hospital"); *Bricker v. Sceva Speare Memorial Hosp., supra,* 281 *A.*2d at 593 (refusal to reappoint physician with staff privileges was supported by finding that he was an active disruptive force in the hospital operation). For disharmony to constitute good cause for dismissal from a hospital staff, however, it is unnecessary that it cause actual harm to patients. *McMillan v. Anchorage Community Hosp.,* 646 *P.*2d 857, 866 (Alaska 1982). A hospital need not wait for a disruptive doctor to harm a patient before terminating his or her privileges. Nonetheless, more should be required than general complaints of a physician's inability to cooperate with others. To constitute disruptive behavior meriting termination of staff privileges, hospital authorities should present concrete evidence of specific instances of misbehavior, such as unjustified altercations with other doctors or nurses, violations of hospital routines or rules, breaches of professional standards, or the commission of some other act that will adversely affect health care delivery. *See Sussman v. Overlook Hosp. Ass'n, supra,* 92 *N.J.Super.* at 182.

In setting the appropriate standard for denial or revocation of a doctor's privileges, we return to the premise that a decision concerning those privileges affects the hospital, the doctor, and his or her patients. We believe we strike the appropriate balance by requiring that the hospital establish that "prospective disharmony will probably have an adverse impact on patient care." *Id.* Although they have phrased the standard variously, other state courts also require proof of probable patient harm or the equivalent. *See, e.g., McMillan v. Anchorage Community Hosp., supra,* 646 *P.*2d at 866 (physician's conduct must pose a "realistic or recognizable threat to patient care which would require immediate action by hospital"); *Miller v. Eisenhower Medical Center,* 27 *Cal.*3d 614, 632, 166

*Cal.Rptr.* 826, 837, 614 *P.*2d 258, 269 (1980) (hospital may reject or terminate staff privileges when prospective disharmony presents a "realistic and specific threat to the quality of medical care"); *Silver v. Queen's Hosp. Ass'n,* 63 *Hawaii* 430, 442, 629 *P.*2d 1116, 1125 (Haw.1982) ("record should * * * indicate that such prospective harmony probably will have an adverse effect on patient care and not merely annoy or displease certain physicians and administrators") (quoting *Sussman v. Overlook Hosp. Ass'n, supra,* 92 *N.J.Super.* at 182). The mere fact that the doctor annoys other doctors, nurses, and administrators is insufficient. *Sussman v. Overlook Hosp. Ass'n, supra,* 92 *N.J.Super.* at 182. A doctor may be so disruptive, however, as to throw the hospital into turmoil and prevent it from functioning effectively. So substantial a disruption could lead the hospital authorities to conclude that the probable outcome will be harm to the patients.

–III–

Because it found that the Board of Governors had improperly prejudged the issue, the Chancery Division reversed the revocation of Dr. Nanavati's privileges. In light of the length of the proceedings before the hospital authorities and the court, however, the Chancery Division tried to bring the matter to a close. The court reasoned that the crucial questions were primarily legal, rather than factual, and that "the administrative remedy [sic] certainly would be futile." Consequently, the court made independent findings of fact based largely on the record made in the tainted hospital proceeding.

Notwithstanding the Chancery Division's conclusion about the futility of further hospital proceedings, we are satisfied that the appropriate judicial response is to permit the hospital, if it so elects, to reinstate the disciplinary proceedings. *See Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 98; *Berman v. Valley Hosp., supra,* 103 *N.J.* at 114. We base that conclusion on the fact that since the Board of Governors voted to terminate Dr. Nanavati's staff privileges, the majority

of its members have been replaced. Only six of the former members remain on the Board. If Dr. Nanavati fears that he will not receive a fair hearing from the hospital authorities, he may move before the Chancery Division to transfer the proceedings to an impartial forum. That court, if it finds that Dr. Nanavati cannot receive a fair hearing, may transfer the matter to an alternative forum such as an arbitrator or panel of arbitrators. Obviously, if the parties can agree on a forum, the court should give great weight to their agreement. In designating any such forum, the court should consider the specialized knowledge of the practice of medicine and of hospital administration that is required to make decisions concerning staff privileges. Failing all else, and as a last resort, the court may conduct a plenary hearing on the charges against Dr. Nanavati.

The judgment of the Appellate Division is affirmed as modified, and the cause is remanded to the hospital.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—none.