273 N.J. Super. 501 (1994)
642 A.2d 1016
ERNEST S. PETROCCO, D.C., PLAINTIFF-APPELLANT,
v.
DOVER GENERAL HOSPITAL AND MEDICAL CENTER; BOARD OF TRUSTEES OF DOVER GENERAL HOSPITAL; EXECUTIVE COMMITTEE OF DOVER GENERAL HOSPITAL; WAYNE C. SCHIFFNER, PRESIDENT OF DOVER GENERAL HOSPITAL, DEFENDANTS-RESPONDENTS,
v.
NEW JERSEY HOSPITAL ASSOCIATION AND THE MEDICAL SOCIETY OF NEW JERSEY, DEFENDANTS-RESPONDENTS-INTERVENORS.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1994.
Decided May 20, 1994.
*506 Before Judges KING, HAVEY and Arnold M. STEIN.
Eugene P. Dolan argued the cause for appellant (Mr. Dolan, on the brief).
Andrew F. McBride, III, argued the cause for respondents (Kalison & McBride, attorneys; Brian M. Foley, on the brief).
Todd C. Brower argued the cause for respondents-intervenors (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; Burton L. Eichler and Todd C. Brower, of counsel; Mr. Brower, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
Plaintiff, a chiropractor, appeals from a judgment of the Chancery Division denying his claim for staff privileges at Dover General Hospital and Medical Center, an acute-care private, general hospital. The hospital's bylaws did not provide for staff privileges for chiropractors and the institution declined to process plaintiff's application. The hospital board appointed an ad hoc *507 committee, all non-physician board members, to consider whether to amend the bylaws. That committee decided there was no need to open the staff to chiropractors and the board agreed. Under our highly deferential standard of review of a hospital's decision on how to structure its staff, we affirm the judgment.

I
Sometime in 1988 the plaintiff requested that the hospital send him an application for staff privileges. A hospital employee told him by telephone that chiropractors were not included as staff members under the bylaws of the hospital. On December 5, 1988 plaintiff wrote to the president of the hospital, asking him for a clarification of this policy. He confirmed in writing that the hospital's bylaws did not allow staff membership for chiropractors.
By letter dated February 22, 1989 plaintiff advised that he was interested in knowing the procedure for changing the bylaws. On March 21, 1989 the president replied and offered this rationale for the exclusion of chiropractors:
Dover General Hospital & Medical Center is not equipped or designed to handle patients requiring chiropractic care, nor is the Hospital in a position to effectively monitor the quality of chiropractic care which you propose to provide. Moreover, there currently is not a demonstrated need for chiropractic services to be provided in an acute care setting within our service area. Consequently, an application for membership to our staff cannot be provided.
Unsatisfied, plaintiff continued to press his position upon the hospital officials for staff admission.
Prompted in part by plaintiff's inquiries, in March 1990 the hospital administration decided to create an ad hoc committee to consider the need for amending the bylaws to add chiropractors to the types of practitioners entitled to staff privileges. A four-member, non-physician committee was appointed. As part of its investigation, the committee requested information from two chiropractic associations. One did not respond; the other provided articles and materials relevant to other hospitals' experiences with chiropractors on hospital staffs. The committee also reviewed materials provided by the hospital's counsel, consisting of an *508 article and a legal memorandum favoring exclusion of chiropractors. The committee met twice to discuss these materials.
On September 27, 1990 the committee issued its report advising the hospital's board of trustees of its unanimous vote to recommend that the bylaws not be revised to permit chiropractors staff privileges. The committee made thirteen findings, which we summarize:
1. New Jersey statutory law did not require that hospitals admit chiropractors;
2. No acute-care hospital in New Jersey had chiropractors on its staff;
3. N.J.A.C. 13:44E-1.1 defined chiropractic as "that discipline whose methodology is the adjustment and manipulation of the articulations of the spine and related structures and whose purpose is the relief of certain abnormal clinical conditions of the human body causing discomfort resulting from the impingement upon associated nerves;"
4. If a chiropractor determined that a patient had a problem not treatable by a chiropractor, the chiropractor was required by law to refer the patient to a medical doctor;
5. Hospital bylaws required that each patient be examined by a doctor of medicine or osteopathy;
6. Under hospital bylaws the treatment of medical conditions had to be directed by a doctor of medicine or osteopathy;
7. The hospital's patients "generally suffer from an acute medical condition requiring medical and/or surgical care, including the use of pharmacological methods, none of which may be prescribed by chiropractors;"
8. The hospital had no record of any patient or staff member ever having requested chiropractic care in the hospital;
9. The hospital had no administrative apparatus in place for the evaluation and approval of admission of chiropractors;
10. "The nature of chiropractic evaluation and treatment is fundamentally different from the evaluation and treatment of patients offered by doctors of medicine and osteopathy in acute care facilities such as the Hospital;"
11. The addition of chiropractors to the staff might expose the hospital to additional liability risks;
12. Chiropractors were authorized to refer their patients to the hospital's x-ray and laboratory facilities for testing, the results of which were sent to the chiropractor;
13. Chiropractors were authorized to refer their patients to the hospital's medical staff for diagnosis and treatment.
Based upon these findings, the committee reached these conclusions:

*509 1. The addition of chiropractors to the Hospital's Medical Staff is not required by law.
2. The addition of chiropractors to the Hospital's Medical Staff is not necessary for the Hospital to carry out its mission of providing acute care services to the community.
3. Any benefits obtained by admitting chiropractors to the Hospital's Medical Staff would be enjoyed by an insignificant number of patients, and would not be necessary to the provision of appropriate acute care services by the Hospital.
4. The admission of chiropractors to the Hospital's Medical Staff would result in substantial direct and indirect costs and an adverse effect on Hospital operations which would far outweigh any resulting benefit.
5. Although chiropractors might enjoy various benefits from admission to the Hospital's Medical Staff, the same would be true of many other health care professionals, such as nutritionists, physical therapists and psychiatric nurses. The Hospital's decision to expand its Medical Staff to include new categories of professionals must be based upon net benefit to the mission of the Hospital and the patients it serves.
6. We concur that chiropractors currently have the right and opportunity to refer their patients to Hospital facilities for x-rays and laboratory tests, and can refer patients to members of the Hospital's Medical Staff for all necessary, nonchiropractic diagnosis or treatment.
At a meeting on September 27, 1990 the hospital board of trustees voted to accept the committee's recommendation. The vote was ten "yes," zero "no," and three abstentions.
In July 1991 plaintiff's counsel requested and was supplied with the hospital's bylaws. The bylaws defined "medical staff" as follows: "[A]ll doctors of medicine, osteopathy, dentistry and podiatry licensed to practice in the State of New Jersey and who are privileged to attend patients at Dover General Hospital." Staff membership was divided into three fields: medical, dental, and podiatric. All applicants for the medical staff were required to be "legally licensed to practice medicine and surgery" in New Jersey.
The bylaws set forth detailed procedures for the processing of applications for the medical staff. In addition, the bylaws granted a right to a formal hearing to any applicant receiving an unfavorable recommendation. If an applicant failed to prevail after a hearing, the applicant had the right to appeal to the board of trustees.
*510 On August 9, 1991 plaintiff requested a hearing under Article 13.03 of the bylaws. On September 19, 1991 the hospital denied plaintiff's request on the ground that as a chiropractor, he did not qualify as an "applicant." In response to a request for further clarification, on October 25, 1991 the hospital again explained that the bylaws afforded no procedural rights to chiropractors. In justification of its decision not to amend its bylaws to include chiropractors, the hospital explained it had "determined that it is not in the best interests of the Hospital and its patients to expand the medical staff to include chiropractors."

II
In January 1992 plaintiff filed a complaint in the Chancery Division and an order to show cause against defendant-hospital, its board of trustees, its executive committee, and its president. Plaintiff alleged that he had been damaged by the hospital's refusal to allow him to apply for staff privileges. He expressed his legal theories in five counts: (1) breach of contract under the hospital's bylaws; (2) common-law due process; (3) constitutional due process; (4) defamation; and (5) the New Jersey Antitrust Act.
The Medical Society of New Jersey and the New Jersey Hospital Association successfully moved for permission to intervene and to participate "as if" they "had been named as original party defendants." The hospital defendants moved for summary judgment and plaintiff filed a cross-motion for summary judgment. The hospital defendants prevailed.
Plaintiff raises these points on this appeal:
1. THE JUDGE ERRED IN FINDING THAT PLAINTIFF WAS NOT ENTITLED TO HAVE HIS APPLICATION CONSIDERED UNDER THE PROCEDURAL SAFEGUARDS OF THE HOSPITAL BYLAWS OR OF CONSTITUTIONAL DUE PROCESS.
2. DISPUTED ISSUES OF FACT PREVENTED SUMMARY JUDGMENT.
3. N.J.S.A. 30:11-1 REQUIRES A HOSPITAL TO OFFER CHIROPRACTIC SERVICES.

*511 4. THE JUDGE ERRED ON THE LAW IN DISMISSING THE DEFAMATION AND ANTITRUST CLAIMS.

III
Plaintiff's principal contention is a denial of procedural due process. As the sources of his alleged right to due process, he invokes the Fourteenth Amendment and the hospital's bylaws. Plaintiff claims that he has a federal constitutional right to have his application processed and considered on its individual merits. He also claims a right to a hearing if the hospital's initial decision is adverse.
Judge Stanton held that plaintiff had no individualized rights to procedural due process or a hearing, because there had been no adjudication of plaintiff's personal qualifications. The judge reasoned:
The decision made by the hospital here was not a decision which involved the evaluation of the credentials and qualifications of an individual practitioner who was generically eligible to apply for membership on the hospital medical staff. It was not a quasi-judicial decision which involved the evaluation of this particular physician, Dr. Petrocco. It was really a management or policy decision as to whether a broad class of people should be eligible to be on the medical treatment staff of the hospital.
And it seems to me that because it was that kind of a decision that due process concepts do not apply. The physician was not, the individual person who wanted to apply, in this case Dr. Petrocco, was not entitled to have a hearing before the hospital at which he could question witnesses, question evidence, present his own evidence, present his own arguments, make arguments against arguments on the other side. He was not entitled to that kind of a hearing because there was no effort being made by the hospital to evaluate his individual qualifications and to pass either favorably or adversely on his qualifications and on his skills.
Instead, the hospital was saying as a matter of policy it did not think that there was a need for it or a utility for it to have this whole class of practitioners.
So in my judgment, [the decision] didn't even involve due process determinations.
The most plaintiff was entitled to receive, the judge observed, was the assurance that the hospital followed its bylaws and that those bylaws reasonably served the public interest. The judge then applied the appropriate standard of review to the hospital's decision not to amend its bylaws to include chiropractors and ruled against plaintiff.
*512 We agree that plaintiff had no individualized right to procedural due process. A private hospital lacks the indicia of "state action" necessary to impose the duty to provide procedural due process to those who are refused staff privileges. In Garrow v. Elizabeth Gen. Hosp. and Dispensary, 79 N.J. 549, 401 A.2d 533 (1979), a physician applied for but was denied staff privileges; he was a medical doctor and belonged to a class of practitioners eligible for admission. The Court rejected the doctor's claim that he was entitled to constitutional due process: "In the absence of a showing, allegation or admission that the Hospital's action reflected state action ..., fundamental constitutional due process may not be invoked." Id. at 563, 401 A.2d 533. Accord Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 91, 514 A.2d 53 (App.Div.), certif. denied, 107 N.J. 32, 526 A.2d 126 (1986).
While aggrieved physicians may have no right to constitutional due process, they are entitled to the lesser standard of "fundamental fairness," i.e., that their request for privileges be considered according to procedures that adequately notify them of the hospital's proposed action and that provide a reasonable opportunity to respond. Garrow, supra, 79 N.J. at 564, 401 A.2d 533; Zoneraich, supra, 212 N.J. Super. at 91, 514 A.2d 53. But plaintiff has cited no case authority, and we have found none, granting procedural protections, under either "due process" or "fundamental fairness" concepts, to a member of a class seeking to have the hospital change its policy barring that class from staff membership, where the hospital has not attempted to adjudicate the merits of the member's personal qualifications. The reason for imposing procedural protections in staff privilege cases is to protect professional reputations and ensure the ability to pursue the profession. Garrow, supra, 79 N.J. at 557, 401 A.2d 533. Neither concern is implicated here: the decision to exclude chiropractors as a class does not impugn plaintiff's personal reputation and his ability to practice chiropractic is not substantially impaired by denial of access to hospital patients through staff privileges.
*513 Plaintiff also urges that he is a third-party beneficiary of the hospital's bylaws which grant him a contractual right to have his application processed under the bylaws, including the provisions for a hearing. He reasons that the bylaws "form a binding contract between the hospital and its existing medical staff and prospective medical staff." He cites a federal case recognizing that an applicant for hospital-staff privileges may be a third-party beneficiary of the hospital's bylaws, if such an intent may be inferred from the language and surrounding circumstances. Robinson v. Magovern, 521 F. Supp. 842, 925-26 (W.D.Pa. 1981), aff'd, 688 F.2d 824 (3d Cir.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). But plaintiff fails to recognize that the court in Robinson found that no such intent was inferable in that case. Ibid. In addition, the doctor-applicant in Robinson was a thoracic surgeon, who met the threshold test for staff membership. Plaintiff in this case was not eligible for staff membership under the bylaws as written. Hence we will not infer that the bylaws were intended to protect plaintiff as a third-party beneficiary.
Plaintiff also relies on a series of cases recognizing that hospital bylaws form a contract between the hospital and its staff. In those cases the aggrieved persons were either already on the staff or were practicing in a field entitled to staff membership. See, e.g., Balkissoon v. Capitol Hill Hosp., 558 A.2d 304 (D.C.App. 1989) (medical doctor was denied staff privileges based on alleged professional deficiencies); Ishak v. Fallston Gen. Hosp. & Nursing Ctr., 50 Md. App. 473, 438 A.2d 1369 (1982) (hospital refused to renew privileges of staff physician).
While plaintiff was not entitled to any procedural protections under the bylaws or the Fourteenth Amendment, he was entitled to have his claim reviewed under the special standard developed by our courts for review of administrative decisions treating exclusion of certain categories of practitioners, as distinguished from decisions on the qualifications of individual applicants. The earliest reported case is Davis v. Morristown Memorial Hosp., 106 N.J. Super. 33, 254 A.2d 125 (Ch.Div. 1969), in which *514 two obstetricians applied for admission to a hospital staff. The hospital refused, invoking its written policy deferring action on new staff applications until sufficient beds became available. The court upheld the policy as supported by evidence that there was a bed shortage and found the hospital "acted from honest motives." Id. at 53, 254 A.2d 125. The court applied the deferential guidelines for review announced by our Supreme Court in Greisman v. Newcomb Hosp., 40 N.J. 389, 192 A.2d 817 (1963), and Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791 (1961). Those cases permitted judicial review of exclusionary policies, on the theory that hospitals acted as fiduciaries for the public and could not exercise their discretion over staff composition without considering the interests of the medical profession and the public. Falcone, supra, 34 N.J. at 496-97, 170 A.2d 791.
Next, in Wrable v. Community Memorial Hosp., 205 N.J. Super. 438, 501 A.2d 187 (Law Div. 1985), aff'd, 213 N.J. Super. 347, 517 A.2d 470 (App.Div. 1986), certif. denied, 107 N.J. 150, 526 A.2d 210 (1987), a psychiatric nurse was denied staff membership on the ground that the hospital did not have a psychiatric department and was not equipped to handle patients needing psychiatric care. Also, the hospital's bylaws provided for staff membership for doctors of medicine, dentistry, osteopathy, and podiatry only. 205 N.J. Super. at 441, 501 A.2d 187.
The Law Division upheld the hospital's exclusion of psychiatric nurses and found a reasonable relationship between that policy and the hospital's health-care mission. Id. at 443-45, 501 A.2d 187. The judge explained:
A hospital has a right and a duty not only to review the qualifications of the members of its staff, but also to consider the need for and impact of new and previously unadmitted persons to the hospital staff and how their admission to the staff would affect patient care. See Belmar v. Cipolla, 96 N.J. 199, 208 [475 A.2d 533] (1984). Since the hospital is unable to review effectively plaintiff's credentials and supervise her activities, it would therefore not be in the best interest of patient treatment and care to allow plaintiff, at this time, to become a member of the adjunct medical-dental staff.
[Id. 205 N.J. Super. at 443-44, 501 A.2d 187.]
Of particular relevance to the appeal before us, the judge added:

*515 Merely because a professional may be able to provide medical aid or psychological comfort to a patient in a hospital does not justify a finding that the individual is entitled to adjunct medical-dental staff privileges. The testimony revealed that there are more than 200 health care professions in the State of New Jersey. In any given case a physical therapist, nutritionist, chiropractor or other professional health care specialist may give aid and comfort to their patients while in the hospital, but this would not justify making them members of the adjunct medical-dental staff. A hospital is entitled to reasonably restrict eligibility for such privileges in order to insure that its patients receive the best care possible on a consistent basis.
[Id. at 444, 501 A.2d 187 (emphasis added).]
Finally, the judge noted that the exclusion had only a minimal impact on plaintiff's practice. Plaintiff was free to treat her patients outside the hospital; during her patients' infrequent hospitalizations, she could see them at visiting hours or talk on the telephone. Ibid.
In Desai v. St. Barnabas Medical Ctr., 103 N.J. 79, 510 A.2d 662 (1986), a medical doctor was denied staff privileges under a written policy granting preference to doctors who had professional associations with existing staff members. In evaluating the validity of the preference, the Supreme Court recognized the special standards of judicial review of hospital-management decisions.
In light of the specialized and sensitive nature of institutional public health care and the paramount responsibilities and concerns of other branches of government in this area, courts are normally most circumspect when called upon to determine the validity or enforceability of managerial health-care decisions made by a hospital. If a hospital policy decision reasonably serves an evident public-health purpose, it will be sustained, even though it may have a discriminatory effect. We have thus recognized that because an adverse or discriminatory impact upon some individual doctors or class of doctors is inevitable when a closed staff-admissions policy is adopted by a hospital, it will be upheld if the public-health objective is rationally advanced by the hospital's staff admissions policy.... However, if it cannot be shown that a restrictive staff-admissions policy reasonably furthers a legitimate health-care objective, then the policy merely constitutes an unjustified vehicle of discrimination and is invalid.
[Id. at 91, 510 A.2d 662 (citation omitted).]
The Court also acknowledged that the standard applied to the hospital's decision is even more deferential than the traditional "substantial competent credible evidence" test of agency decisions; rather, it is whether the decision was based on "sufficient reliable evidence, including hearsay." Id. at 92, 510 A.2d 662. Accord *516 Nanavati v. Burdette Tomlin Memorial Hosp., 107 N.J. 240, 249, 526 A.2d 697 (1987). And a more tolerant test is used where the decision was based on broad institutional policy as opposed to adjudication in an individual case:
When the decision that is subject to judicial review involves the validity of a broad, general hospital policy determination, rather than a particularized, quasi-adjudicative decision in which a general policy is applied in an individual case, even greater informality can be tolerated. A hospital determining broad policy matters should be able to pursue all reasonable means to inform itself and to draw from a wide array of sources to reach an informed decision.
[103 N.J. at 92, 510 A.2d 662.]
Finally, the Court reasoned, in developing such a general policy the hospital
need not provide public notice, conduct formal proceedings, allow general participation, or develop a formal record in support of a managerial determination. Thus, a hospital decision of this character will be viewed favorably if it is reached in the normal and regular course of conducting the affairs of the hospital and is based on adequate information, regardless of form, origin, or authorship, that is generally considered reasonable and reliable by professional persons responsibly involved in the health-care field.
[Id. at 93, 510 A.2d 662.]
Applying these standards to the admissions preference at issue, the Court held that the record failed to support the hospital's claims of a public-health purpose or benefit; hence the policy was invidiously discriminatory. Id. at 93-97, 510 A.2d 662.
In Berman v. Valley Hosp., 103 N.J. 100, 510 A.2d 673 (1986), two doctors were denied admission under a policy refusing privileges "to doctors who practiced medicine in the hospital's service area for more than two years." Id. at 101, 510 A.2d 673. The reason for the policy was to avoid "a problem of overcrowding and overutilization that was attributable to doctors from surrounding areas obtaining staff privileges" at defendant-hospital. Id. at 103, 510 A.2d 673.
As in Desai, the Court in Berman applied a most deferential standard of review: "in reviewing the validity of the kind of broad, quasi-legislative policy determination, such as presented in this case, the freedom of decisional action accorded a hospital is even greater and judicial review more tolerant." Id. 103 N.J. at 107, *517 510 A.2d 673. Such action is limited, however, by the requirements that: (1) it be reached in the normal course of hospital affairs; (2) it be based on adequate information; and (3) it reasonably advance the intended health-care objectives. Id. at 108, 510 A.2d 673. The Court struck the policy on these two grounds:
We conclude that the hospital has failed to marshall adequate information that demonstrates that its particular restrictive admissions policy is sufficiently related to a genuine and legitimate health-care objective. In its present formulation, the admissions policy ban against doctors from particular locations has not been justified and appears in most respects to be arbitrary. Further, the two-year practice limitation has not been shown on this record to be sufficiently related to its professed health-care objective of securing staff physicians who are both highly-educated and also have few patients.
[Id. at 113, 510 A.2d 673.]
In dicta the Berman Court opined that "a staff-admissions policy that focuses upon an applicant's years of licensure, length and type of experience, quality of medical education, and caliber of medical training, as well as the volume and residences of private patients, would be entitled to favorable judicial consideration." Id. at 114, 510 A.2d 673.
Judge Stanton here followed this limited review function. He examined the hospital's response to plaintiff's request and was impressed by its diligence and fairness:
The hospital here did not simply reject this application.... [B]ecause the management of the hospital realized that there had not been a careful and recent look taken by the hospital at the question of whether chiropractors should be able to be on the treatment staff, it undertook to review that question, not in the sense of having formal adversarial type hearings, but in the sense of making an inquiry, collecting information, trying to evaluate the information and make a sensible recommendation to the Board.
In my view, what the Board did here, or at least what the hospital management and the non-physician members of the Board, and by default the physician members of the Board, did was to have designated trustees review the situation, study it, make a recommendation to the Board, and then the Board decided that there was no current need or utility, net utility to having chiropractic doctors admitted to the staff.
In my view, the broad methodology followed was appropriate and the result reached was broadly reasonable. That is to say, it makes sense.
*518 The judge was not concerned with whether the hospital's decision was "right" or whether he agreed with it. Rather, he was compelled to defer to the hospital's judgment of whether chiropractors were necessary to or compatible with the hospital's medical-care mission. And he found it significant that the Legislature had intervened specifically to recognize and approve staff access to dentists, N.J.S.A. 45:6-19.5, and podiatrists, N.J.S.A. 26:2H-12.1, but not to chiropractors. Hence the hospital's decision contravened no statutory law or public policy. Moreover, our research discloses that no bill has ever been introduced in our legislature on the subject of admitting chiropractors to hospital staffs. At oral argument, plaintiff's counsel stressed that the chiropractic profession wanted admission to hospital staffs for economic reasons, that is, to insure their competitive position in the health-care service market. Such economic arguments are best addressed to the legislature. Also, our research discloses that state courts consistently reject claims in law suits by chiropractors for admission to hospital staffs. See Fort Hamilton-Hughes Memorial Hosp. Ctr. v. Southard, 12 Ohio St.3d 263, 466 N.E.2d 903 (1984); Boos v. Donnel, 421 P.2d 644 (Okla. 1966); Cohn v. Wilkes Regional Medical Ctr., 113 N.C. App. 275, 437 S.E.2d 889 (1994); Samuel v. Curry County, 55 Or. App. 653, 639 P.2d 687 (1982).
We find Judge Stanton's ruling unassailable. The hospital did more than the law required. Instead of simply rejecting plaintiff's application offhandedly, it convened a special committee, which solicited evidence from both sides of the issue and reached a reasoned opinion not to change its bylaws. It acted deliberatively and in the course of the normal administration of hospital affairs, and only after receiving adequate information. Desai, supra, 103 N.J. at 93, 510 A.2d 662. The hospital board's opinion was grounded in a finding that the continued exclusion of chiropractors reasonably served genuine health-care objectives. Ibid. For example, the ad hoc committee found that chiropractors were not necessary to the hospital's acute-care mission, that an insignificant *519 number of patients would require chiropractic services, and that the administrative costs of adding chiropractors would outweigh any benefits. The committee reached these conclusions only after studying a substantial compilation of materials obtained from the American Chiropractic Association.
Neither Judge Stanton nor this court should second-guess the hospital's honest administrative judgment. Plaintiff has identified no countervailing public policy, nor has he demonstrated that the hospital fell short of the Desai-Berman standards for adopting a broad policy of exclusion. Plaintiff argues that chiropractic is a respectable health-care field which deserves treatment equal to dentists, podiatrists, osteopaths, and medical doctors. But he does not effectively refute the reasons offered by the hospital for differential treatment. As the judge recognized, those reasons "made sense" and may not be disregarded by a reviewing court. The hospital's decision was supported by the requisite "sufficient reliable evidence." Nanavati, supra, 107 N.J. at 249, 526 A.2d 697.

IV
Plaintiff next urges that the judge erred in failing to rule that N.J.S.A. 30:11-1 mandates the hospital to offer chiropractic services. N.J.S.A. 30:11-1 is part of the legislation governing state licensure of private hospitals. That provision announces a "public policy" of establishing and enforcing "basic standards" of hospital care. It forbids hospitals from operating without a license, issuance of which is dependent upon the Department of Health's judgment that the hospital is "adequately prepared" to provide the services it offers. In the sentence relied on by plaintiff, the Legislature imposed a further condition: "No license shall be granted to a hospital facility unless the commissioner is satisfied that it is adequately prepared to provide all services and care required by the residents of the community wherein it is located." N.J.S.A. 30:11-1. Plaintiff reasons that, because chiropractic services are "required" in the community where the hospital is *520 located, the denial of staff admission to chiropractors violates N.J.S.A. 30:11-1.
The judge did not expressly address the N.J.S.A. 30:11-1 argument which was not precisely presented to him. He impliedly rejected it when he reasoned that the courts must defer to the hospitals' and Commissioner of Health's judgment as to what services must be provided by each hospital.
As the hospital and intervenors observe, on its face the statute does not mandate chiropractic services. Rather, it demands only those services that are "required" by the community. The decision as to what services are required lies within the discretion of the hospital. This discretionary judgment, calling for the expertise of the hospital governing body, is entitled to substantial judicial deference. Here the hospital determined, in effect, that chiropractic services were not required. That decision was supported by evidence. In his reply brief, plaintiff cites some contradictory evidence in the record but there was ample evidence supporting denial of privileges. Moreover, N.J.S.A. 30:11-1 is part of a licensing scheme for hospitals. It grants no remedies to individuals who have not been allowed to apply for staff privileges.

V
Plaintiff next claims that he was libelled by three characterizations of chiropractors contained in an article submitted to the ad hoc committee during its investigation. He insists that the judge erred in ruling as a matter of law that the article was not actionable defamation.
The article was written by Richard J. Webb and Brian M. Foley and appeared in a 1989 publication called Health Span, a Prentice Hall release. Both Webb and Foley are members of the law firm representing the hospital in this case. Webb was the editor of Health Span, and Foley wrote the hospital's appellate brief.
The article was a review of then-recent history of attempts by chiropractors to obtain staff privileges. It cited a 1987 federal *521 district court case holding that each hospital had the right to make its own decision, based upon its own bylaws, applicable state law, and the needs of its patient community. See Wilk v. American Medical Association, 671 F. Supp. 1465 (N.D.Ill. 1987), aff'd, 895 F.2d 352 (7th Cir), cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 524 (1990). It then reviewed the legal, regulatory, and judicial authorities that hospitals must consult in deciding whether to admit chiropractors.
Plaintiff alleges that the defamation consisted of the following:
In the first paragraph of the article, chiropractors are characterized as "an unscientific cult", "unscientific practitioners" and it further states that it is "unethical" for physicians to be associated with chiropractors.
Plaintiff terms these statements "false" and defamatory and alleges that they tainted the committee's findings.
Plaintiff's representations of the article are, at best, disingenuous. The offending phrases were quotations from American Medical Association comments, and the stated intent of Webb and Foley was to show that such negative attitudes toward chiropractors had changed, such that chiropractors now enjoyed "professional recognition and acceptance." The tone of the article as a whole was not negative toward chiropractic; rather, its purport was as a neutral guide on how hospitals should respond to requests by chiropractors for admission. Far from counselling arbitrary rejection of such requests, the article urged hospitals to "proceed in a deliberate and fair manner" and to decide only "after due consideration of all reasonably available information."
The threshold inquiry in a libel action is whether defendant published a false statement of fact which was reasonably susceptible of a defamatory meaning as to plaintiff. Kotlikoff v. The Community News, 89 N.J. 62, 67, 444 A.2d 1086 (1982); Salek v. Passaic Collegiate School, 255 N.J. Super. 355, 359, 605 A.2d 276 (App.Div. 1992). Each of these preliminary questions must be decided by the court as a question of law, usually in response to a motion to dismiss or for summary judgment. Kotlikoff, supra, 89 *522 N.J. at 67, 444 A.2d 1086; Salek, supra, 255 N.J. Super. at 359, 605 A.2d 276.
This article fell well short of satisfying the elements for a prima facie case. First, whether chiropractic is "scientific" and whether it is "unethical" for a doctor to associate with a chiropractor is arguably an opinion not provable as true or false. Second, and more clearly, the article was not susceptible of a defamatory meaning, whether of plaintiff or anyone else. Indeed, the article as a whole tended to bolster the reputation of chiropractic. Finally, even if the statements were defamatory, they were not published by the hospital. The hospital committee and board members may have read a defamatory article and considered it in reaching a decision but this does not render the hospital liable for defamation. The hospital neither re-published the article generally nor disseminated it to a person not having a legitimate interest in the subject matter.
The judge relied on the last ground, reasoning that the act of circulating documents among members of the committee could not constitute publication. Also, he impliedly held that any negative information was privileged:
[I]n terms of trying to get quality decisions made, allowing hospitals to be sued for defamation, if members of their boards considered negative statements made by professional health groups, one about the other, would be to put shackles on the intellectual processes by which sound decisions could be made.
New Jersey courts recognize a qualified privilege to make defamatory statements on matters lying within the publisher's interest or duty, where those statements are made to one having a corresponding interest or duty. See Williams v. Bell Telephone Laboratories, Inc., 132 N.J. 109, 121, 623 A.2d 234 (1993).

VI
Plaintiff next complains of the dismissal of his antitrust cause of action. He insists that he "has provided a sufficient factual basis from which the elements of intent and conspiracy may be reasonably inferred." The participants in the conspiracy, he charges, *523 were "defendant hospital along with the defendant hospital Association and the defendant Medical Society," all of whom joined "to successfully bring about a group boycott of chiropractic physicians in a hospital setting." Plaintiff deems this concerted action to be "a per se violation" of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19. The pertinent prohibition is stated in N.J.S.A. 56:9-3: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful."
In analyzing claims of anticompetitive conduct under N.J.S.A. 56:9-3 and the cognate provision of the federal act, 15 U.S.C.A. § 1, our courts apply one of two rules: (1) the "per se rule"  requiring no proof of the market power of the offending parties, or (2) the "rule of reason"  calling for an assessment of the economic impact on the market. Desai, supra, 103 N.J. at 97-98, 510 A.2d 662; Belmar, supra, 96 N.J. at 215-18, 475 A.2d 533. Though in dicta our Supreme Court has expressed a preference for the "rule of reason" in staff privileges cases, it has not yet chosen between the rules. Desai, supra, 103 N.J. at 98-99, 510 A.2d 662; Belmar, supra, 96 N.J. at 215, 475 A.2d 533. Because of an independent ground for disposing of this issue, we need not choose between these rules.
Plaintiff pleaded this theory against the hospital defendants only. Both intervenors were permitted to participate "as if" they "had been named as original party defendants." Though plaintiff never amended his complaint to include intervenors, in moving for summary judgment on the antitrust count, he did include them in his allegation of a conspiracy.
The judge disposed of this claim this way:
Finally, there's no basis for anti-trust claims, either state or Federal, against the originally named defendants in this case. They all constitute a single entity for the purposes of considering anti-trust laws in doctoring. There simply is no capacity for there to be any conspiracy among the named defendants.
Theoretically, theoretically, there could be a conspiracy involving the hospital association and medical societies, theoretically. But the reality is they only became *524 involved in this case after Dr. Petrocco brought it to Court and they simply wanted to be heard.
There's no reason why they shouldn't be heard; no conspiracy involved there. There isn't. There's no semblance of an anti-trust claim that's made here.
The hospital argues that this court need not reach the merits of plaintiff's argument, since the hospital was exempt from the Antitrust Act. The hospital invokes N.J.S.A. 56:9-5b(5), which exempts from the reach of the act: "The bona fide religious and charitable activities of any not for profit corporation, trust or organization established exclusively for religious or charitable purposes, or for both purposes...." The hospital in this case without dispute "is a private, nonprofit corporation organized under the laws of the State of New Jersey."
From this record it is unclear whether the hospital's purpose is "charitable," or, if so, whether "charitable activities" encompass decisions relating to staff privileges. One Chancery Division decision held, without analysis, that most of the defendant-hospitals in that case were exempt under N.J.S.A. 56:9-5(b)5. Borland v. Bayonne Hosp., 122 N.J. Super. 387, 405, 300 A.2d 584 (Ch.Div. 1973), aff'd o.b., 136 N.J. Super. 60, 344 A.2d 331 (App.Div. 1975), aff'd, 72 N.J. 152, 369 A.2d 1, cert. denied, 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977). More recently, our Supreme Court has expressly declined to decide whether the hospitals before it were exempt under N.J.S.A. 56:9-5(b)5. Desai, supra, 103 N.J. at 99 n. 9, 510 A.2d 662; Belmar, supra, 96 N.J. at 219, 475 A.2d 533. In light of the uncertainty over the scope of this exception in this context, we proceed to the merits of the antitrust argument.
As the judge implied, a hospital is incapable of conspiring with its staff in deciding whether to grant staff privileges. See generally Tim A. Thomas, Annotation, Denial by Hospital of Staff Privileges or Other Health Care Practitioner as Violation of Sherman Act, 89 A.L.R.Fed. 419 (1988). Thus, in Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989), the hospital's executive committee was authorized by the bylaws to make recommendations to the hospital's governing board on matters *525 of staff privileges. The Third Circuit held that, under principles of federal antitrust law, the hospital was not capable of conspiring with its executive committee, because the two entities had no conflicting interests. 857 F.2d at 118. Plaintiff concedes the foregoing rule but urges us to apply the well-established exception for cases when the conspiring employees or staff have an independent personal stake apart from the interest of the hospital.
Plaintiff attempts to bolster his theory by bringing the two intervenors into the alleged conspiracy. But, as the judge observed, there is no proof that the intervenors took any part in the hospital's decision; rather, they voluntarily joined this case in order to argue their legal position in favor of the decision that the hospital had already made. They had no input into the decision itself. Plaintiff contends that intervenors have "a stake" in upholding the ban on chiropractors, but he does not show or even allege that they did anything in concert with the hospital. It is not enough to assert that intervenors "have the ability to conspire;" there must be at least a prima facie showing of conspiratorial conduct in fact. The judge properly dismissed the antitrust claim.
Finally, we reject plaintiff's contention that the matter was not ripe for summary judgment. Both parties moved for summary judgment. See Morton International v. General Acc. Ins., 266 N.J. Super. 300, 323, 629 A.2d 895 (App.Div. 1991), aff'd, 134 N.J. 1, 629 A.2d 831 (1993).
Affirmed.