92 N.J. Super. 163 (1966)
222 A.2d 530
BERNARD J. SUSSMAN, M.D., AND DOMINICK A. SCIALABBA, M.D., PLAINTIFFS,
v.
OVERLOOK HOSPITAL ASSOCIATION, A NON-PROFIT NEW JERSEY CORPORATION, AND THE TOWN OF WESTFIELD, A MUNICIPAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 28, 1966.
*167 Mr. Richard H. Thiele, Jr., for plaintiffs (Messrs. Wharton, Stewart & Davis, attorneys).
*168 Mr. Nicholas Conover English for defendant Overlook Hospital Association (Messrs. McCarter & English, attorneys).
Mr. Horace E. Baker for defendant Town of Westfield.
MINTZ, J.S.C.
This action seeks to review the validity of the action of the Overlook Hospital Association (Overlook) in denying plaintiffs' applications for appointment to the medical staff.
Plaintiffs ask that Overlook be directed to set up procedures and afford them a hearing on their rejected applications for medical staff appointment. If plaintiffs are denied relief as against Overlook, then they seek to enjoin defendant Town of Westfield (Westfield) from contributing financially to said hospital. They contend that Westfield is violating the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution by annually contributing to a quasi-public institution which engages in unreasonable, arbitrary and discriminatory practices.

I.
Plaintiffs practice medicine in partnership, specializing in neurosurgery. Dr. Sussman is one of about 18 neurosurgeons in New Jersey certified by the American Board of Neurosurgery, and Dr. Scialabba is one of about 12 other physicians eligible for board certification. Both plaintiffs have exceptional medical and educational backgrounds. It is conceded that their medical competence is not an issue in this case.
Dr. Sussman and Dr. Scialabba formed their partnership in June 1964. Previously Dr. Sussman had offices in Plainfield and Perth Amboy, which plaintiffs now operate together. Both plaintiffs enjoy hospital privileges at Muhlenberg Hospital in Plainfield and Perth Amboy General Hospital in Perth Amboy. Neurosurgery is basically a hospital practice, with the offices being utilized only for short periods of time *169 for patient consultations. Neurosurgeons receive most of their patients through referrals.
In the summer of 1964 the partnership opened an office in Westfield because there were no other neurosurgeons in that area. The Westfield community is served by both Muhlenberg and Overlook on approximately a 50-50 basis. In the summer of 1964 plaintiffs applied to Overlook for courtesy staff privileges. They felt they could better serve the Westfield community by having privileges at both Muhlenberg and Overlook Hospitals. Many Westfield patients prefer to be hospitalized at Overlook, and Westfield doctors who have staff privileges at Overlook prefer that patients they refer to a specialist be hospitalized at Overlook so that they can attend to their post-operative treatment.
Dr. Sussman was interviewed by the credentials committee of Overlook Hospital on November 17, 1964. The credentials committee minutes reflect that Drs. Erdman, Green, Langgaard and Wagner were present; that the meeting started at 8:15 P.M. and was adjourned at 8:40 P.M., and that Dr. Sussman and a Dr. Bromberg were interviewed and considered by the committee for appointment to the medical staff. The committee recommended that Dr. Sussman's application be denied, noting that he was already on the staff of two hospitals, that he lived in Plainfield, and that Overlook already had four neurosurgeons on its staff: one on the consulting staff, two on the attending staff, and one on the courtesy staff.
On January 19, 1965 Dr. Scialabba was interviewed by the credentials committee. His application was recommended for rejection, the same factors being noted as in the case of Dr. Sussman. Present at this meeting were Drs. Bennett, Erdman, Langgaard, Terhune and Wagner. The minutes reflect that Dr. Scialabba indicated in response to inquiry that he had no interest in working in Overlook on a solo basis without Dr. Sussman. In the course of his testimony before this court, Dr. Scialabba stated that a partnership practice afforded the opportunity for one partner to cover for the *170 other. Hence, his suggested possible appointment without that of Dr. Sussman would be of no interest to him.
Concerning the interviews of both applicants, the minutes of the credentials committee were respectively accepted by the meetings of the medical staff executive committee. The applications of plaintiffs were then passed on to the joint advisory committee (a committee of laymen and physicians) for their recommendations. This committee considered these applications on March 22, 1965. The minutes of this meeting indicate that the files on the two applicants were carefully reviewed and the recommendations of the credentials committee considered. The same factors noted by the credentials committee were again noted on the record. The joint advisory committee unanimously resolved to recommend to the board of trustees that the applications of Dr. Sussman and Dr. Scialabba be denied.
On March 25, 1965 the chairman of the joint advisory committee presented the applications of Drs. Sussman and Scialabba to the executive committee of the board of trustees of Overlook for their consideration. The minutes of the joint advisory committee were read into the record and made part of the minutes of this committee meeting. The executive committee was reminded that it was its duty to decide upon matters of this kind and not to place responsibility for such decisions on the medical staff. After discussion and questions, it was unanimously resolved that the applications be denied.
Upon being informed of the rejection of his application in a brief letter which assigned no reasons for such rejection, Dr. Sussman wrote to Overlook requesting reconsideration of his and Dr. Scialabba's applications, and an opportunity to appear personally in support of their applications. Dr. Sussman's attorney also wrote, requesting a hearing and advice as to the grounds upon which plaintiffs were rejected. Thereafter, Mr. Robert E. Heinlein, Director of Overlook, telephoned Dr. Sussman and informed him of the reasons for the denial of his application as set forth in the minutes of *171 the March 22, 1965 meeting heretofore noted. On April 19, 1965 the joint advisory committee decided that since the reasons for the denial recently were communicated to Dr. Sussman, and since the by-laws of the Overlook Hospital Association do not contemplate a hearing on behalf of an applicant not approved for privileges, no further action need or should be taken. On April 22, 1965 the meeting of the full board of trustees of Overlook approved this decision made by the joint advisory committee. All procedures followed concerning the applications of Drs. Sussman and Scialabba strictly conformed with the by-laws of Overlook and the by-laws of the medical staff.
The by-laws of the medical staff of Overlook Hospital, in article III, section 1A, provide as qualifications for appointment that:
"The application for membership on the Medical Staff shall be a graduate with a degree of doctor of medicine of a medical school approved by the American Medical Association, legally licensed to practice in the State of New Jersey, a member of good standing in the medical society of the county in which he is practicing, and shall have established an office in the geographical area served by Overlook Hospital as designated by the Board of Trustees, excepting that appointments to the staff in special services may be made from outside the Overlook area where a vacancy exists that cannot be filled from the Overlook area."
Both Drs. Sussman and Scialabba fulfill all these requirements.
The reasons formally advanced for denying plaintiffs' applications were not the real reason for the denial. It appears that Overlook was disposed to consider Dr. Scialabba's application favorably if it was not bracketed with that of Dr. Sussman. The fact that Overlook already has four neurosurgeons on its staff is not really relevant. Neurosurgeons bring their own patients to the hospital for care, and if Drs. Sussman and Scialabba did not have referral patients of their own to bring to Overlook, they would have no need to use the facilities.
*172 The fact that plaintiffs have medical staff appointments in two other hospitals is also not particularly relevant except in the sense that they will not be deprived of the opportunity to make a living by the denial of their applications. There was some suggestion that membership on two other hospitals is enough. However, other neurosurgeons on Overlook's staff have at least three other appointments to hospitals, with Dr. Green on the staff of nine others and Dr. Liss on eight.
The fact that plaintiffs live in the Plainfield area is not of any consequence. The important factor is that plaintiffs have an office in Westfield which is in the geographic area served by Overlook. The testimony indicates that without hospital privileges at Overlook plaintiffs will not be able efficiently to serve the Westfield community, or effectively develop a Westfield practice.
The essential reason for the denial of plaintiffs' applications was the alleged "personality problems" of Dr. Sussman. Overlook sent questionnaires to the hospitals with which the applicants were or had been affiliated. On August 19, 1964 Mr. Robert S. Hoyt, Administrator of Perth Amboy General Hospital, returned this questionnaire answering the following questions in the negative: "Does he get along well with other members of the Medical Staff as well as the nursing staff? Did he follow hospital policies and procedures, administrative and medical?" In the space reserved for additional comments, Mr. Hoyt filled in the following:
"I would suggest that you contact Mr. Frank Sauer, Director Muhlenberg, who is in a position to give you a complete rundown on this doctor and his attitude and the problems that he creates. They have been extensive here."
Mr. Sauer, Administrative Director of Muhlenberg Hospital, answered the above two questions respectively as follows: "With some members  not with others." "Usually, but has frequently challenged and questioned established procedures and authority." Mr. Sauer did not make any additional comments.
*173 Prior to the credentials committee meeting of November 17, 1964, Mr. Heinlein, Director of Overlook, telephoned both Hoyt and Sauer concerning their answers to the questionnaire. He sent a memorandum to the credentials committee which reads:
"Dr. Wagner requested that I send you a memorandum concerning Dr. Sussman's application.
I have been informed by reliable sources at both Perth Amboy General and Muhlenberg Hospitals that although competent professionally he has been very difficult in personal relationships within the hospital, and very difficult to get along with and to please.
Since he already has an appointment at Muhlenberg which is one of the hospitals serving the Westfield area, I see no need for his appointment to the Overlook Staff."
The members of the credentials committee called to testify and the chairman of the joint advisory committee all agreed that the basic reason for rejection of plaintiffs' applications was the so-called "personality problems" of Dr. Sussman and his difficulties at the other hospitals. None of them knew the nature of Dr. Sussman's disputes with the respective hospital officials and, though called to an interview, Dr. Sussman was not asked to give his version of any "trouble" at Muhlenberg and Perth Amboy General. Mr. Heinlein testified that he did not specifically inquire into the nature of the "troubles" allegedly created by Dr. Sussman. Mr. Hoyt testified that since answering the questionnaire he has had further experience with Dr. Sussman and that his answers would now be different and more favorable to Dr. Sussman. It is to be noted that Dr. Sussman is currently on the staffs of Muhlenberg and Perth Amboy General Hospitals. He has not been asked to resign, nor were any disciplinary charges taken against him in either institution.
Plaintiffs argue that this failure to investigate and give Dr. Sussman a hearing constitutes arbitrary, unreasonable and discriminatory practice on the part of Overlook, and that Overlook should be ordered to reconsider plaintiffs' applications following appropriate procedures, such as affording Dr. *174 Sussman an opportunity to be heard. They further urge that Overlook should not weigh such factors as Dr. Sussman's "personality problem" or prospective "staff harmony" in consideration of an application for staff privileges, as such a standard is so nebulous, vague and ambiguous as to provide a substantial danger of discrimination.
Defendant urges that there is no basis for judicial interference in this case; that Overlook is a private and not a public hospital, and that membership therein is a privilege and not a right. It asserts that Overlook has followed all its by-laws and has acted in good faith as a fiduciary. It contends that as a fiduciary it has a right and duty to consider medical staff harmony as it relates to patient care, in weighing the merits of an application for staff privileges.

II.
This case presents a judicially cognizable issue. Other jurisdictions hold that a private hospital as opposed to a public hospital has the right to exclude any physician from practicing therein without being subject to judicial review. Annotation, 24 A.L.R.2d 850 (1952), and supplements. New Jersey has taken a different view. In recent cases our courts have shown a willingness to review actions of private hospitals affected with a public interest. Joseph v. Passaic Hospital Assn., 26 N.J. 557 (1958); Raymond v. Cregar, 38 N.J. 472 (1962); Greisman v. Newcomb Hospital, 40 N.J. 389 (1963).
In Greisman the importance of this public-private dichotomy was swept aside. The court there held that private, non-profit hospitals, such as Overlook, though private in the sense that they are nongovernmental, are public in the sense that they are devoted to the public use. Overlook receives governmental support; solicits funds from the public, including the Westfield community; has dedicated itself to the public, and performs public functions of serving the sick and injured. This abolition of the public-private hospital dichotomy in determining whether a case was judicially cognizable has received *175 considerable support. Chaffee, "The Internal Affairs of Association Not For Profit," 43 Harvard L. Rev. 993 (1930); Note, "Judicial Control of Actions of Private Associations," 76 Harvard L. Rev. 983 (1963); Case Comment, 18 Rutgers L. Rev. 704 (1964); Note, "Hospital Staff Privileges: The Need For Legislation," 17 Stanford L. Rev. 900 (1965).
The fact that membership on a hospital staff is a privilege, Hayman v. City of Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927), and not a right is not significant. There are many different kinds of privileges and rights, and the labels alone should not determine whether actions regarding them are reviewable. As was said in Alpert v. Board of Governors of City Hospital, 286 App. Div. 542, 145 N.Y.S.2d 534, at p. 538 (App. Div. 1955), "Valuable privileges * * * are also entitled to the protection of law." A physician does not have a right to hospital affiliation, but Greisman indicates that a physician does have a right to be treated fairly when he applies for staff membership. It was there said:
"Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good." (40 N.J., at pp. 403-404)
See also Davis, "The Requirement of a Trial-Type Hearing," 70 Harvard L. Rev. 193 (1956).
*176 It is true that in this case there is no element of monopoly power and economic deprivation of a right to earn a living, as was present in Falcone v. Middlesex County Medical Society, 34 N.J. 582 (1961), and to a more limited extent in Greisman. Dr. Sussman admitted that he has a large income and will continue to have one although denied appointment to Overlook's medical staff. Also, his membership on the staffs of Muhlenberg and Perth Amboy General shows that his livelihood is not affected. The same is true of Dr. Scialabba. However, it is not necessary to find monopoly or deprivation of all economic opportunity before there is a case for judicial review. Greisman indicates that since the function of the private organization in question is public, judicial review is available to hold said organization to conduct becoming a fiduciary.

III.
The cognizable issue here is simply whether or not Overlook has reasonably exercised its fiduciary duty to furnish facilities to members of the medical profession in aid of their service to the public. Greisman indicates that "while the managing officials may have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed * * * as fiduciary powers to be exercised reasonably and for the public good" (40 N.J., at p. 402). Again, the court refers to selection powers as "powers in trust," but that "reasonable and constructive exercises of judgment should be honored" (at p. 404). The problem in this case is to give content to this language.
Defendant cites Raymond v. Cregar, supra, as direct authority for the proposition that if a hospital's trustees observe procedural due process by following the procedures prescribed in the by-laws, they can properly decline to reappoint a member on the staff without assigning any reasons for their decision. That case is not authority for the stated proposition. In Raymond the suit was by the plaintiff physician *177 against individual doctors, trustees and the hospital for damages sounding in slander, breach of contract and malicious interference with plaintiff's profession, based upon a refusal to reappoint him to the hospital staff. The court expressly indicated that plaintiff did not raise, and it was not passing upon, the question whether, notwithstanding the by-laws, he was entitled to continue on the medical staff unless he was not reappointed for good cause shown at a hearing.
The determination whether a hospital's trustees have discharged their fiduciary duty in acting upon applications for staff appointment cannot be resolved by merely ascertaining whether the trustees have complied with the by-laws. Such by-laws may be self-serving to those in power, and a court should not hesitate in promoting natural justice to fill any gaps in a hospital's rules. Chaffee, supra, at p. 1015; Note, "Judicial Control of Actions of Private Associations," 76 Harvard L. Rev. 983 (1963). In Greisman the court voided a by-law that was deemed arbitrary and unreasonable.
Overlook contends that it fulfilled its fiduciary obligation by acting in good faith in rejecting plaintiffs' applications. There is no evidence that defendant's actions were improperly motivated or that discretion was exercised with mala fides. However, acting with an absence of mala fides is not sufficient.
In the case at bar defendant Overlook rejected plaintiffs essentially because of answers to questionnaires it received from Muhlenberg and Perth Amboy General that Dr. Sussman had created problems there. Defendant did not ascertain the nature of these "problems." Having these questionnaires before them, the credentials committee did not mention them to Dr. Sussman so that they could hear his side of the story. It was enough for Overlook that it knew that Dr. Sussman had done something that certain hospital administrators had considered as causing trouble.
As fiduciaries, Overlook officials should have endeavored to determine the nature of Dr. Sussmans difficulties with *178 Muhlenberg and Perth Amboy General. The mere report of "problems" or "disharmony" without further investigation should not have served as a basis for exclusion. Overlook should have been concerned with the kinds of problems Dr. Sussman had caused and the nature and causes of his inability to get along with certain hospital personnel. Exclusion in the absence of thorough inquiry, as was the case here, might tend to muzzle conscientious physicians from speaking out against abuses in hospital practices. As was said in Rosner v. Eden Township Hospital District, 58 Cal.2d 592, 25 Cal. Rptr. 551, 375 P.2d 431 (Cal. Sup. Ct. 1962):
"* * * The goal of providing high standards of medical care requires that physicians be permitted to assert their views when they feel that treatment of patients is improper or that negligent hospital practices are being followed. Considerations of harmony in the hospital must give way where the welfare of patients is involved, and a physician by making his objections known, whether or not tactfully done, should not be required to risk his right to practice medicine." (25 Cal. Rptr., at p. 555, 375 P.2d, at p. 435)
In fairness to the physician and the public, proper fiduciary conduct in the instant situation calls for a substantial inquiry into the fitness of Dr. Sussman to serve on the medical staff of Overlook. Fairness dictates that Dr. Sussman be afforded an opportunity to be heard and to present proof which may indicate that the disfavor he has incurred with the hospital administrators and possibly some physicians may have been occasioned by his frank and perhaps tactless criticisms of certain hospital practices and deficiencies in nursing personnel. He is prepared to present evidence that on the whole his relationships with his colleagues and nursing personnel are harmonious. The record, when thoroughly reviewed, may support the conclusion that all his criticisms were essentially motivated by a desire to improve the quality of patient care, and that rather than being a troublesome and disruptive personality, he is a constructive individual who insists upon the patient's receiving the best available care.
*179 The record also discloses that six months prior to his application for appointment to Overlook, Dr. Sussman opposed the appointment of Dr. Liss as a consultant at Muhlenberg. He recognized the professional competency of Dr. Liss, a neurosurgeon also on the Overlook staff, but believed that he should receive a staff appointment and thereby shoulder some of the hospital responsibilities. Dr. Green, a neurosurgeon on the credentials committee, admitted that Dr. Liss spoke to him and opposed Dr. Sussman's application. Dr. Liss' opposition may have been in good faith and in the interests of hospital harmony, but should not Dr. Sussman be afforded the opportunity to submit proof of his earlier difference with Dr. Liss as background to that doctor's opposition to him?
Additionally, plaintiffs contend Overlook should have informed them of the reasons for their rejection. Defendant indicated that the true grounds for plaintiffs' rejection were not spread upon the record so as to protect them from any adverse effects such public disclosure might have, and to protect the hospital and individuals acting for the hospital from any liability that might occur from such disclosure. If the physician requests the hospital to advise him of the reasons for his rejection, fair play requires that the hospital make such disclosure. Without being so informed, it is impossible for a physician to determine what course of action to follow or how to improve his standing in the eyes of the hospital authorities. As to the fear of exposure to liability, the law is settled in New Jersey that statements made by one in the performance of his duty as a trustee or hospital staff member are privileged as long as made in good faith. Raymond v. Cregar, supra.
The recent decision in Schneir v. Englewood Hospital Association, 91 N.J. Super. 527 (Law Div. 1966), is consonant with the views herein expressed. There the application of the osteopathic physician for appointment to the medical staff was deferred for future action. The court observed that plaintiff's chief complaint was not the denial of appointment but *180 that the reasons expressed in court had never been told to him. The court did not deal specifically with this complaint but held, on substantially different facts, that the hospital properly exercised its fiduciary obligation. Schneir is not authority for the proposition that a hospital may refuse upon request of the physician to specify the true reasons for the rejection of his application.

IV.
Plaintiffs urge that Overlook should not be allowed to consider prospective disharmony among the medical staff or temperamental unsuitability as a standard for admission. They urge that this court should adopt the rationale in Rosner, supra, 25 Cal. Rptr. 551, 375 P.2d 431, where it was said
"Moreover, a hospital district should not be permitted to adopt standards for the exclusion of doctors from the use of its hospital which are so vague and ambiguous as to provide a substantial danger of arbitrary discrimination in their application. In asserting their views as to proper treatment and hospital practices, many physicians will become involved in a certain amount of dispute and friction, and a determination that such common occurrences have more than their usual significance and show temperamental unsuitability for hospital practice of one of the doctors is of necessity highly conjectural. In these circumstances there is a danger that the requirement of temperamental suitability will be applied as a subterfuge where considerations having no relevance to fitness are present. * * *" (25 Cal. Rptr., at p. 555, 375 P.2d, at p. 435)
Alternatively, it is urged that since medical staff appointments are only for one year, admission should be allowed, with prospective disharmony evaluated after actual experience in connection with reappointment.
There is likely to be a difference from a practical standpoint as to the effect of exclusion from a hospital prior to admittance and expulsion after affiliation has become a fact. In the first instance the public is not likely to become aware of the decision, and adverse effects upon the applicant will be *181 kept to a minimum. In the latter situation certain patients are sure to become aware of the refusal to renew privileges, established patterns of referral to or by other physicians will be disturbed, and the physician's reputation may be damaged. Understandably, some individuals will be loath to speak out against a doctor knowing that his reputation as a physician is at stake. Hence it is easier to gather the necessary information upon an initial application for staff privileges. If, therefore, staff harmony is to be a factor in passing upon an applicant's qualifications, it may be considered prospectively upon initial application.
The testimony at trial as to the importance of "harmony" and "teamwork" in modern patient care was conflicting. A thoughtful and critical consideration of the Rosner decision, in Note, "Hospital Staff Privileges: The Need For Legislation," 17 Stanford L. Rev. 900 (1965), had this to say about considerations of prospective disharmony in selecting staff members:
"* * * The intricacies of modern medical and surgical practice often require the consultation and assistance which the staff provides. Staff meetings to review the work being done in the hospital may supplement individual consultation and advice and the valuable experience gained from hospital practice. Thus, considerations of team spirit and cooperativeness can be as important as technical skill in recommendations for staff appointments; or, put another way, professional competence in hospital practice should, according to modern hospital theory, include qualities needed for cooperative staff work. * * *" (at p. 905)
This court is of the view that Overlook as a fiduciary could reasonably consider the factor of prospective disharmony in passing upon an application for staff privileges. However, as a fiduciary it must be careful that in avoiding disharmony it is not stopping valid, constructive criticism of hospital practices. As heretofore observed, physicians must not be unduly deterred from speaking out against hospital practices they deem not to be in the best interest of patient care.
*182 As aptly observed in Rosner, supra, there is the grave danger that an inquiry as to the applicant's "personality." "temperamental suitability" and propensity to disrupt staff harmony is so ambiguous and vague that it may be used as a subterfuge to mask considerations of professional jealousy, personal dislikes, or other factors having no relevancy to the issue of fitness for staff appointment. In considering such factors, particularly in the physician's relationship with nursing personnel, allowance must be made for the stress that a dedicated neurosurgeon undergoes in the performance of his delicate duties. The fact that the applicant has, as Mr. Sauer stated, "frequently challenged and questioned established procedures and authority," is not per se a factor indicative of any disqualification. Such challenge indeed may be constructive and lead to improvements in patient care. Dr. Liss testified to the fine medical competence of Dr. Sussman, but seriously questioned his staff relationships. Certainly, this vague, nebulous type of testimony will not support a rejection.
A denial of a physician's application upon the basis that his appointment will cause disharmony among the medical staff must be clearly and persuasively supported by the record. The record should also clearly and persuasively indicate that such prospective disharmony probably will have an adverse effect on patient care and not merely annoy or displease certain physicians and administrators. Certainly, the record in its present posture will not support any such finding as to Dr. Sussman.

V.
I conclude that Overlook failed to fulfill its fiduciary obligation in passing upon plaintiffs' applications. When requested to disclose the basis for the rejections, reasons other than the essential reason were assigned. It failed to make a fair and thorough inquiry into the alleged "troubles" caused by Dr. Sussman at Muhlenberg and Perth Amboy General *183 Hospitals. It failed to accord plaintiffs an opportunity to be heard.
Defendant is directed to formulate the necessary procedures in order to insure a fair and thorough determination of plaintiffs' applications. It shall act upon this problem within 90 days after the entry of judgment or, in default thereof, admit plaintiffs to medical staff privileges.
The by-laws of the hospital may have to be amended so as to spell out the manner in which an appeal should be conducted for a rejected applicant. He should be informed of the reasons for the rejection of his application. The procedure should provide for the applicant to appear in person if he so desires and present witnesses and appropriate documents.
I do not believe this inquiry by a fiduciary should be equated to that of a judicial hearing. Hospitals are not equipped to conduct judicial or quasi-judicial hearings, nor do they have the power to subpoena witnesses. The practical difficulties in producing witnesses for examination may be insurmountable. Hence it is not essential that plaintiffs be afforded the right to confront and cross-examine witnesses, or to be represented by counsel in the presentation of their case before the hospital authorities. See "Development in the Law, Judicial Control of Actions of Private Associations, 76 Harvard L. Rev. 983, 1027 (1963). In brief, while the procedure on appeal from the denial of an application for initial appointment need not take on all the aspects of a formal judicial or quasi-judicial hearing, it should insure a fair and thorough consideration of the applicant's case and provide a complete record which may be the subject of judicial review.
In the light of the foregoing, the alternative relief sought against the Town of Westfield is denied.
An appropriate form of judgment will be submitted, consented to as to form or be settled upon notice.