**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0436-23

MARK E. SOLOMON, D.P.M.,

     Plaintiff-Respondent,

v.

MEDICAL EXECUTIVE
COMMITTEE OF MORRISTOWN
MEDICAL CENTER, and
MEDICAL-DENTAL STAFF
OF MORRISTOWN MEDICAL
CENTER,

     Defendants-Appellants.

_____

> Argued March 5, 2024 – Decided August 8, 2024
>
> Before Judges Haas, Natali and Puglisi.
>
> On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000076-22.
>
> Jacob S. Perskie argued the cause for appellant Medical Executive Committee of Morristown Medical Center (Fox Rothschild LLP, attorneys; Heather R. Boshak and Jacob S. Perskie, of counsel and on the briefs).

The Nan Gallagher Law Group LLC, attorneys for appellant Medical-Dental Staff of Morristown Medical Center, have not filed a brief.

Joseph B. Fiorenzo argued the cause for respondent (Sills Cummis & Gross PC, attorneys; Joseph B. Fiorenzo, of counsel and on the brief; Stephen M. Klein, on the brief).

James H. Leckie argued for amicus curiae New Jersey Hospital Association (O'Toole Scrivo, LLC, attorneys; James J. DiGiulio, of counsel and on the brief; James H. Leckie, on the brief).

Buttaci Leardi & Werner LLC, attorneys for amicus curiae New Jersey Podiatric Medical Society (John W. Leardi, on the brief).

PER CURIAM

We granted leave to appeal to address the propriety of the court's intervention in the internal administrative proceedings commenced by defendants Medical Executive Committee of Morristown Medical Center (MEC) and Medical-Dental Staff of Morristown Medical Center (MDS) (collectively defendants) to address the suspension of plaintiff Mark E. Solomon's, D.P.M., clinical privileges. Specifically, defendants challenge the court's August 28, 2023 order denying their reconsideration application of a July 24, 2023 order that granted, in part, plaintiff's order to show cause and directed the hospital to use the burden of proof announced in Nanavati v. Burdette Tomlin Mem'l Hosp.,

2

A-0436-23

107 N.J. 240 (1987),[1] rather than the standard detailed in defendants' bylaws. Defendants argue the court erred both in intervening prior to the conclusion of the hearing, and in ordering the use of the Nanavati standard. We agree with defendants and reverse.

## I.

Dr. Solomon is a podiatrist with clinical privileges at Morristown Medical Center (MMC) and Overlook Medical Center (OMC). According to Article XI, section (C)(1) of MMC's bylaws, the President of the Medical Staff, the Chief Medical Officer (CMO), and the Administrator or the Board Chair each have the authority to "suspend or restrict all or any portion of an individual's clinical privileges whenever the failure to take such action may result in imminent danger to the health and/or safety of any individual or may interfere with the orderly operation of the Hospital" or "whenever the conduct of any individual with clinical privileges is such that it causes harm, is detrimental to, or is likely to impair the confidence of patients in the reputation or standing of Atlantic

---

[1] In Nanavati, the court considered "the appropriate standard of review of the decision by a hospital to terminate a physician's staff privileges" and determined "hospital authorities should present concrete evidence of specific instances of misbehavior" and that such "prospective disharmony will probably have an adverse impact on patient care." 107 N.J. at 248, 254.

A-0436-23

Health System, the Hospital, the Medical Staff, Board of Trustees or the communities they serve."

Further, the bylaws characterize a "[p]recautionary suspension as "an interim step in the [p]rofessional [r]eview activity, but it is not a complete [p]rofessional [r]eview action in and of itself," and "[i]t shall not imply any final finding of responsibility for the situation that caused the suspension."

Additionally, Article XII of defendants' bylaws addresses the hearing and appeals process applicable "whenever the [MEC] makes an unfavorable recommendation" with respect to, among other things, the suspension of clinical privileges. Section (F)(1) provides the "order of presentation":

a. The [MEC] or Board shall first present evidence in support of its recommendation and shall bear the burden of demonstrating that its recommendation is reasonable and warranted.

b. Thereafter, consistent with the burden on the individual to demonstrate that he or she satisfies, on a continuing basis, all criteria for appointment and/or clinical privileges, as appropriate, the Hearing Panel shall recommend in favor of the [MEC] unless it finds that the individual who requested the hearing has proved, by clear and convincing evidence, that the recommendation that prompted the hearing was arbitrary, capricious, or not supported by credible evidence, or was contrary to law.

A-0436-23

In December 2021, Drs. Sharon Root, D.P.M., and Lewis Rubinson, M.D., plaintiff's Department Chair and CMO, respectively, issued plaintiff a "letter of warning" which alleged, among other things, that plaintiff did not have medical privileges for procedures he performed on two patients. Specifically, the letter referenced a case in which plaintiff performed an "incision and drainage of the tibia or tibial osteotomy," and a second case in which he conducted an "osseous procedure[] to the tibia or fibula above the level of the ankle."

The letter notified plaintiff his "cases will be subject to review to ensure [he is] practicing within the privileges granted" at MMC, and that if it was "determined that [he was] acting outside the scope of [his] privileges, the matter will be escalated to the [MEC] for review and action." The letter of warning also included other concerns regarding plaintiff's professional conduct, namely, "sending deprecating and insulting text messages followed by accosting [his] Department Chair at a social gathering after [he was] told [he] could not be the primary surgeon in a revision procedure."

Plaintiff responded in writing, disputing the charges in the warning letter and subsequently met with Dr. Rubinson, Dr. Wittig (Chair of Orthopedic Surgery), Dr. Daniel Hennessy (Vice Chair of Podiatry), Dr. John O'Grady (President of Hospital Medical-Dental Staff), and Dr. Mark Rieger (plaintiff's

practice partner). Following that meeting, Dr. O'Grady sent two letters to plaintiff, the second of which modified the first and set a deadline for plaintiff to complete certain criteria.

In the second letter, dated March 31, 2022, Dr. O'Grady confirmed plaintiff agreed to: (1) participate in one-on-one sessions with a professional wellness expert at least three times per month for at least six months; (2) formally acknowledge that MMC defines his scope of practice through its credentialing and privileging process, and that final adjudication and determination of his privileges would be determined by the Chair of Podiatry and other MMC leadership; and (3) provide a written apology to Dr. Root for admitted contentious behavior. The letter indicated plaintiff had five days, until April 5, 2022, to submit "documentation regarding the above issues."

In response, plaintiff's partner, Dr. Reiger, sent Dr. Rubinson a text message with a draft of plaintiff's letter and inquired if it was satisfactory. The draft letter stated plaintiff: (1) identified a wellness professional to administer a customized professional treatment plan, (2) acknowledged he "reviewed the MMC bylaws and rules and regulations, as well as the [p]odiatry department bylaws and [his] current MMC privileges sheet"; understood he would be "held to the same standards of providing care within [his] scope of practice

6

commensurate with other practicing members of [the] department with equivalent rights"; and agreed to have an orthopedic partner "present whenever appropriate," and (3) sent Dr. Root an apology letter. Dr. Rubinson responded, "I can't speak to the response without getting an official response."

On April 13, 2022, Dr. O'Grady sent plaintiff a letter in which Dr. O'Grady stated despite "collegial efforts" and a letter of warning, plaintiff remained "non-compliant with the requirements set forth in the March 31[] letter and ignored [his] physician leaders." Dr. O'Grady also stated, "the matter was referred to the [MEC] for further review and determination," and that on April 12, 2022, the MEC met and determined (1) plaintiff's failure to acknowledge the scope of his privileges could result in imminent danger to patients and could interfere with the orderly operations of the hospital, and (2) plaintiff's "unprofessional conduct" was violative of the MMC's code of conduct. Dr. O'Grady informed plaintiff the MEC suspended plaintiff's clinical privileges, initiated further investigation, and informed plaintiff of his right to be heard during the process.

In May 2022, the MEC issued a report following its investigation and interview of plaintiff in which the MEC concluded plaintiff "could not affirmatively acknowledge the basic principles as set forth in paragraph (2) of the March 31[] letter," and that plaintiff "remained incredulous in his comments

and responses and continued to demonstrate a lack of respect or deference to authority." The MEC kept plaintiff's suspension in place and stated "in order for reinstatement to be considered" plaintiff must:

> 1. Confirm and acknowledge[] in writing to the MEC that MMC defines his scope of practice through it[s] credentialing and privileging process and that the ultimate adjudication and determination of his privileges are determined by the Chair of Podiatry and, when relevant, with the input of the Chair of Orthopedics and other MMC leadership (Medical Staff President, Chair Credentials, and CMO)[.]
>
> 2. Submit for an outside evaluation by a specialist/provider . . . to determine his fitness to practice in the hospital and department settings and his ability to demonstrate recognition for authority and chain of command and appropriate professionalism of a Medical Staff Member . . . .
>
> 3. . . . demonstrate his compliance with paragraph (1) of the March 31[] letter and what the current status is to date . . . .
>
> 4. Once items 1 through 3 above are satisfied . . . it will be within the exclusive discretion of the MEC to consider concluding the suspension and reinstating [plaintiff's] privileges.

Dr. O'Grady informed plaintiff of MEC's report and decision, and plaintiff requested a hearing, which he was entitled to under defendants' bylaws.

Thereafter, plaintiff filed a verified complaint and order to show cause seeking judicial review of his suspension, a preliminary injunction reinstating

A-0436-23

his clinical privileges pending his hearing, and damages. In support, plaintiff included two expert reports which, according to plaintiff, opined he acted within the scope of his privileges in performing the two procedures in question.[2] In a May 31, 2022 order, the court found plaintiff did not demonstrate irreparable harm, a likelihood of success on the merits, or exhaust his administrative remedies, and denied plaintiff's application.

In September 2022, Dr. O'Grady informed plaintiff the MEC convened to review his response to the May 2022 report and considered "all information available," including a psychological evaluation,[3] to "make a final recommendation regarding [plaintiff's] privileges.[4] The MEC recommended plaintiff's privileges be reinstated "subject to a Focused Professional Practice Evaluation (FPPE)," which is a "restriction of [plaintiff's] privileges," thus entitling him to a fair hearing.[5] After unsuccessful attempts to amicably resolve

---

[2] The expert reports are not included in the record before us.

[3] The psychological evaluation is not included in the record before us.

[4] The record is unclear as to what plaintiff submitted to the MEC in response to the May 2022 report.

[5] The parties did not include the specifics of the proposed FPPE. Defendants' bylaws, however, define a FPPE as "a process whereby the Medical Staff evaluates the privilege-specific competency and professional performance of a

A-0436-23

the matter, plaintiff requested a hearing in February 2023, and defendants "held" the MEC's recommendation to reinstate plaintiff's privileges pending the hearing. As such, plaintiff's privileges remained suspended.

Prior to the hearing, plaintiff's counsel submitted a motion with respect to the burden of proof in the hearing, which defendants opposed. Specifically, plaintiff contended the burden of proof outlined in the bylaws improperly shifted the burden for him to establish by clear and convincing evidence defendants' actions were arbitrary, capricious, or not supported by credible evidence, a standard plaintiff argued "would be nearly impossible to meet." Plaintiff also contended defendants should have to "prove its case by a preponderance of the evidence," rather than merely demonstrating its recommendation was reasonable and warranted.

In April 2023, Matthew R. Streger, the presiding officer of plaintiff's hearing, issued a decision on the motion in which he stated he did "not hold the authority to establish the burden of proof in this matter," and denied plaintiff's motion. Specifically, Streger stated plaintiff's application "would involve overriding a clear and unambiguous provision in the bylaws," and the cases

---

practitioner . . . when a question arises regarding a currently privileged practitioner's ability to provide safe, high[-]quality care."

plaintiff relied on were not persuasive to the contrary. Streger explained "the MEC has the initial burden of demonstrating that the proposed action against Dr. Solomon is reasonable and warranted," and plaintiff then has the burden to "demonstrate, by clear and convincing evidence, that the proposed action is arbitrary, capricious, not supported by the credible evidence, or is contrary to law." Streger also noted plaintiff's argument his burden should be "reduced" was unsupported by case law.

Thereafter, plaintiff filed an order to show cause seeking injunctive relief reinstating his clinical privileges and requiring a different burden than outlined in the bylaws apply to his hearing. Specifically, plaintiff argued the burden of proof outlined in Nanavati should apply to his hearing, rather than the order of presentment in the bylaws in which, as noted, provides:

> a. The [MEC] or Board shall first present evidence in support of its recommendation and shall bear the burden of demonstrating that its recommendation is reasonable and warranted.
>
> b. Thereafter, consistent with the burden on the individual to demonstrate that he or she satisfies, on a continuing basis, all criteria for appointment and/or clinical privileges, as appropriate, the Hearing Panel shall recommend in favor of the [MEC] unless it finds that the individual who requested the hearing has proved, by clear and convincing evidence, that the recommendation that prompted the hearing was arbitrary, capricious, or

11

> not supported by credible evidence, or was contrary to law.
>
> [Emphasis added.]

The court granted in part, and denied in part, plaintiff's application and issued a July 24, 2023 conforming order. Specifically, the court granted plaintiff's request the Nanavati burden of proof be applied in his fair hearing, but denied his request to be immediately reinstated. Analyzing plaintiff's request for injunctive relief through the factors outlined in Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982), the court found plaintiff faced immediate and irreparable harm "if a standard that contravenes Nanavati is employed" because an improper standard would deprive plaintiff a fair hearing and monetary damages would be an insufficient remedy.

Next, the court found the second Crowe factor satisfied as it "it is well-settled that the [c]ourt may intervene in administrative proceedings where a hospital acted in contravention to any of the four inquiries" detailed in George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994).[6]

---

[6] In Harms, the Court stated, "[i]n light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited," and noted the "judicial role" is limited to four inquiries:

With respect to likelihood of success on the merits, the court found plaintiff satisfied the factor because if the ultimate outcome of plaintiff's administrative hearing is the termination of plaintiff's privileges, the decision would have to meet the <u>Nanavati</u> standard. It explained that standard would require hospital authorities to show "'prospective disharmony' caused by [p]laintiff 'will probably have an adverse impact on patient care' through a demonstration of 'concrete evidence,'" and the burden would then shift to plaintiff to establish by clear and convincing evidence defendants' decisions were arbitrary, capricious, not supported by credible evidence, or contrary to law. Finally, the court found the balance of hardships weighed in plaintiff's favor should defendants ultimately determine not to reinstate plaintiff's privileges as the hearing, without injunctive relief, would have been fundamentally unfair.

---

(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[137 N.J. at 27.]

Thereafter, defendants moved for reconsideration which the court denied in an August 28, 2023 order and accompanying statement of reasons. The court rejected defendants' argument the court's interpretation of Nanavati was palpably incorrect as the holding in that case was applicable only to the termination of a practitioner's privileges on the basis of disruptive behavior. The court disagreed and explained, "[w]hile Nanavati is limited to termination, the termination referred to is that of staff privileges, and not of employment." The court noted plaintiff's privileges could be terminated in this case, "even temporarily and even non-exhaustively," and "a precautionary suspension effectively terminates certain privileges for the litigant." The court accordingly denied defendants' motion for reconsideration and this appeal followed. We subsequently granted motions by the New Jersey Hospital Association (NJHA) and the New Jersey Podiatric Medical Society (NJPMS) to participate as amici curiae.

II.

In their first substantive point before us, defendants rely on Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 557-60 (1979) and Nanavati, 107 N.J. at 248, in contending the court improperly intervened in a hospital administrative proceeding because plaintiff had not exhausted intra-hospital

administrative remedies. Defendants also argue, relying on <u>Zoneraich v.</u> <u>Overlook Hosp.</u>, 212 N.J. Super. 83, 91 (App. Div. 1986), when courts review "credentialing decisions," that review only occurs after the completion of a fair hearing, and only to determine if the process was fundamentally fair and if the record contains sufficient reliable evidence to justify the result.

Defendants also argue the court erred in granting plaintiff injunctive relief contrary to <u>Garrow</u> and subsequent case law which hold courts are to avoid intervening with internal hospital procedures until the fair hearing is completed. Defendants assert the court's intervention upended both the status quo and fair hearing process, as well as ignored the substantial public interest in deferring staffing decisions to hospitals.

According to defendants, <u>Garrow</u> held hospitals are akin to administrative agencies due to their subject matter expertise and as such, the concept that administrative remedies should be fully exhausted prior to judicial action applies to hospitals. Defendants acknowledge plaintiff's ability to contest his hearing but argue such contest should only occur at the conclusion of the hearing. Defendants also note if plaintiff prevails in the fair hearing, there will be no need for judicial intervention. Defendants further argue the exhaustion of

15

administrative remedies also affords the court with a complete record in the event of judicial review.

Defendants also assert because the court "inserted" an inapplicable burden into the hearing process, defendants will be prejudiced and, unless the court's order is vacated, will not have an opportunity to address the error until after both the completion of the hearing and the resolution of plaintiff's civil claims. Defendants argue Zoneraich, 212 N.J. Super. at 91, "makes clear that so long as the practitioner received fundamentally fair process and substantial credible evidence supports the [h]ospital's decision, then the [h]ospital has acted in good faith."

On this point, amicus curiae NJHA generally echoes defendants' position and argues "courts have acknowledged that hospitals and their administrative bodies are better positioned than courts to make certain decisions, including those regarding the composition of their medical staff." NJHA contends the courts afford hospitals certain deference, including "an administrative agency-like model for judicial review for the [f]air [h]earing substance and procedure."

Plaintiff and amicus curiae NJPMS disagree and contend Garrow does not impose a categorical rule barring judicial review of intra-hospital proceedings prior to completion, as Garrow recognizes certain exceptions to the general rule,

16

such as review of a legal question. Plaintiff and NJPMS argue the trial court intervened to address a legal issue raised in plaintiff's application, and the intervention was therefore proper.

In their second substantive point before us, defendants argue even assuming the court properly intervened, the court erred by ordering the Nanavati burden proof be used in plaintiff's hearing process as that standard applies to a physician's termination of privileges, but does not apply to the precautionary suspension of plaintiff's privileges and subsequent recommendation those privileges be reinstated with restrictions. Defendants assert the newly inserted burden on proof contradicts the reasons for a precautionary suspension, such as patient safety, and also contradicts "the basis for limited review of fair hearings."

According to defendants, the Nanavati standard, by its own holding, is expressly limited to the termination of a physician's privileges when that termination is based solely on disruptive behavior. Defendants state they are not seeking to terminate plaintiff's privileges and termination of plaintiff's privileges is not an issue at the pending hearing. Rather, defendants precautionarily suspended plaintiff's privileges and subsequently recommended reinstatement with certain restrictions. Defendants also state while no case

17

provides the required standard for a precautionary suspension, the bylaws do provide such a standard and plaintiff is bound by the bylaws.

Defendants contend the <u>Nanavati</u> standard cannot apply to a precautionary suspension because such a suspension is not a final determination and there would therefore be no need for a higher standard when dealing with termination of privileges. To apply the <u>Nanavati</u> standard to precautionary suspensions, according to defendants, would result in the hospital having to wait until a physician's refusal to abide by hospital authority resulted in actual harm before being able to take action.

On this point, NJHA again generally coincides with defendants' positions and, specifically, it agrees that the trial court committed reversible error by applying a burden of proof different than provided by the bylaws. NJHA contends the court's insertion of the <u>Nanavati</u> standard frustrates the idea that hospitals are generally entitled to run their own business so long as they do so fairly. NJHA agrees with defendant that no case expressly states the required burden of proof when conducting a fair hearing with respect to a precautionary suspension, as <u>Nanavati</u> concerned termination of privileges. NJHA asserts because the bylaws address the burden of proof when addressing a precautionary suspension, rather than a termination, the bylaws are lawful. Further, NJHA

argues the court should not impose a higher burden for suspension than provided by a hospital's bylaws when the burden provided in the bylaws is not contrary to law.

Plaintiff and amicus curiae NJPMS disagree and argue the trial court correctly held the Nanavati standard applies here as the standard is more broadly applicable than defendants maintain. Plaintiff and NJPMS also contend defendants' bylaws should not be used in the fair hearing process as they improperly contradict Nanavati.

III.

We first address the standard of review with respect to the two orders before us. A trial court's decision to deny a motion for reconsideration will be upheld on appeal unless the motion court's decision was an abuse of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (citation omitted). Similarly, "a trial court's decision pertaining to injunctive relief is reviewed for an abuse of discretion." N. Bergen Mun. Utils. Auth. v. I.B.T.C.W.H.A. Local 125, 474 N.J. Super. 583, 590 (App. Div. 2023).

A-0436-23

"However, appellate review is de novo where the disputed issue relating to the injunctive relief is a question of law." Ibid.

We first turn to defendants' argument the court improperly intervened during the fair hearing process and prior to plaintiff exhausting intra-hospital administrative remedies. In Garrow, the plaintiff doctor filed a complaint and order to show cause seeking to restrain the defendant hospital from conducting a hearing on his staff application until he was able to examine all documents in defendant's possession relevant to his application, and to have counsel present during the hearing. 79 N.J. at 552-53. We reversed the court's dismissal, finding the "adequacy of the hearing implicated concepts of fundamental procedural due process," and thus justified judicial action. Id. at 556.

The Supreme Court disagreed "that judicial review at th[at] interlocutory stage was warranted." Id. at 557. It explained staff appointment procedures before a non-profit private hospital board were subject to the same concepts and rules of judicial intervention applicable to administrative agencies, reasoning the boards of such hospitals "are managing quasi-public trusts . . . [which] ha[ve] a fiduciary relationship with the public." Ibid. (quoting Doe v. Bridgeton Hosp. Ass'n, Inc., 71 N.J. 478, 487 (1976)).

A-0436-23

One such "fundamental concept," the Court found, is "that administrative remedies should be fully explored before judicial action is sanctioned." Id. at 558. It reasoned this exhaustion doctrine serves several important ends, including (1) preventing unnecessary judicial intervention, which could occur if the complaining party prevails; (2) discouraging piecemeal litigation generally; (3) giving appropriate deference to the expertise of the agency or hospital; (4) deciding issues "after factual disputes have been resolved by the fact-finding body and not in a vacuum"; and (5) "permit[ting] 'the administrative process to go forward without interruption.'" Id. at 559-60 (quoting McKart v. United States, 395 U.S. 185, 194 (1969)). With respect to hospital staffing decisions in particular, the Court noted hospitals have particular expertise in determining a physician's qualifications and the hospital's needs, and are "vested with a broad managerial discretion to seek improvement in medical care" as the board's decisions "could have a substantial impact on the quality of care to be provided." Id. at 559.

Significantly, the Court noted the exhaustion doctrine is "not an absolute," but exceptions exist in certain circumstances such as:

> when only a question of law need be resolved, Nolan v. Fitzpatrick, 9 N.J. 477, 487 (1952); when the administrative remedies would be futile, Naylor v. Harkins, 11 N.J. 435, 444 (1953); when irreparable

21

harm would result, <u>Roadway Express, Inc. v. Kingsley</u>, 37 N.J. 136, 142 (1962); when jurisdiction of the agency is doubtful, <u>Ward v. Keenan</u>, 3 N.J. 298, 308-309 (1949); or when an overriding public interest calls for a prompt judicial decision, <u>Baldwin Const. Co. v. Essex Cty. Bd. of Taxation</u>, 24 N.J. Super. 252, 274 (Law Div. 1952), <u>aff'd</u> 27 N.J. Super. 240 (App. Div. 1953).

[<u>Id.</u> at 560.]

"Even assuming that principles of fundamental fairness support the plaintiff's claim," the Court concluded, before intervening a court should "weigh and consider the offsetting factors of orderly procedure, elimination of unnecessary judicial proceedings, and due deference to the expertise of and available to the board concerning medical competency and professional ethics in view of the broad management discretion vested in the board in such matters." <u>Id.</u> at 563.

The Court further described the appropriate considerations before permitting the exhaustion doctrine to be waived in <u>N.J. Civil Service Ass'n v. State</u>, 88 N.J. 605, 613 (1982). It explained:

we are not particularly concerned with the label or description placed on the issue but are concerned with underlying considerations such as the relative delay and expense, the necessity for taking evidence and making factual determinations thereon, the nature of the agency and the extent of judgment, discretion and expertise involved, and such other pertinent factors . . . as may

22

fairly serve to aid in determining whether, on balance, the interests of justice dictate the extraordinary course of bypassing the administrative remedies made available by the Legislature.

[Ibid. (quoting Roadway Express, Inc. v. Kingsley, 37 N.J. 135, 141 (1962)) (alteration in original).]

With this guidance in mind, we are convinced the court should not have intervened. As described in more detail infra in section IV, the question of which standard governs the hearing involves factual determinations, most importantly the nature of the underlying allegations against plaintiff and the remedy sought by defendant. Additionally, as noted in Garrow, a hospital is "vested with a broad managerial discretion" and we should afford deference to its expertise in determining the qualifications of its medical staff and its needs. 79 N.J. at 559.

Further, judicial intervention at this point allowed piecemeal litigation of the issues, which would have been unnecessary if plaintiff were to prevail. And, if plaintiff did not prevail, he could have sought relief from the court with the benefit of a fully-developed factual record. Each of these circumstances leads us to the conclusion it was not appropriate for the court to intervene and bypass defendants' internal process. See Garrow, 79 N.J. at 559-60.

IV.

In light of our decision the court should not have intervened in the fair hearing process, we need not reach defendants' second argument that the court erred in directing the <u>Nanavati</u> standard be applied to the hearing instead of the standard set forth in defendants' bylaws. In the interest of thorough and complete appellate review of the parties' arguments, however, we nevertheless address that issue and also agree with defendants.

In general, "[j]udicial review of hospital decisions regarding admission to medical staff, extent of privileges and termination is very limited." <u>Zoneraich</u>, 212 N.J. Super. at 90. Indeed, "[h]ospital officials are vested with wide managerial discretion, to be used to elevate hospital standards and to better medical care." <u>Ibid.</u> (citing <u>Griesman v. Newcomb Hosp.</u>, 40 N.J. 389, 403 (1963)). Because a hospital's purpose is to serve the public, "[s]o long as hospital decisions concerning medical staff are reasonable, are consist[e]nt with the public interest, and further the health care mission of the hospital, the courts will not interfere." <u>Ibid.</u> (citing <u>Desai v. St. Barnabas Med. Ctr.</u>, 103 N.J. 79 (1986), and <u>Belmar v. Cipolla</u>, 96 N.J. 199, 208 (1984)). Any "[j]udicial review of a hospital board action 'should properly focus on the reasonableness of the

action taken in relation to the several interests of the public, the [physician], and the hospital.'" Id. at 91 (quoting Garrow, 79 N.J. at 565) (alteration in original).

Even affording such deference, "a physician is entitled to fundamentally fair procedures in a non-profit hospital's consideration of staff membership, the extent of privileges and termination." Hurwitz v. AHS Hosp. Corp., 438 N.J. Super. 269, 296 (App. Div. 2014) (quoting Zoneraich, 212 N.J. Super. at 91). As such, courts have held the following to constitute fundamental fairness: notice of the charges or proposed action prior to a hearing, a fair and unbiased tribunal, a qualified right to counsel and right disclosure of certain information. Id. at 296-97 (citing Zoneraich, 212 N.J. Super. at 91, and Garrow, 79 N.J. at 566-68).

In Nanavati, the Court considered "the appropriate standard of review of the decision by a hospital to terminate a physician's staff privileges" and determined "hospital authorities should present concrete evidence of specific instances of misbehavior" and that such "prospective disharmony will probably have an adverse impact on patient care." 107 N.J. at 248, 254. The hospital defendant in that case sought to revoke the plaintiff cardiologist's staff privileges due to "[a]cts of [d]isruptive [b]ehavior," alleging plaintiff violated a provision of its bylaws which required a staff doctor "be of a temperament and disposition

25

that will enable him to work in harmony with his colleagues . . . the professional, technical, and other personnel in the hospital, and with the administration . . . ." Id. at 243-45.

The Court acknowledged "most hospitals have established procedures to make and review decisions affecting [staff] privileges" which are entitled to deference. Id. at 250-51. It explained that deference is based on "[s]everal factors," including (1) the purpose of such procedures to provide "a fair method for making decisions concerning staff privileges" outside the judiciary, (2) the "extensive regulation" governing hospitals, and (3) the "expertise in both medical treatment and hospital administration" required to run a hospital. Ibid.

The Court also recognized cooperation among medical staff is "critical in a modern hospital, where no single doctor cares for all the needs of any one patient," and while "[a] hospital need not wait for a disruptive doctor to harm a patient before terminating his or her privileges . . . more should be required than general complaints of a physician's inability to cooperate with others." Id. at 252, 254. It thus held "hospital authorities should present concrete evidence of specific instances of misbehavior" to demonstrate a doctor's "disruptive behavior merit[s] termination of staff privileges." Id. at 254. Because decisions denying or revoking privileges affect the hospital, the doctor, and the patients,

26

the Court concluded it "str[uck] the appropriate balance by requiring that the hospital establish that 'prospective disharmony will probably have an adverse impact on patient care.'" Ibid. (quoting Sussman v. Overlook Hosp. Ass'n, 92 N.J. Super. 163, 182 (Ch. Div. 1966)).

Contrary to plaintiff's assertions, we are satisfied Nanavati does not govern the circumstances before us. That case involved a situation where the hospital's decision to terminate the doctor's privileges was based purely on the doctor's allegedly disruptive behavior. Id. at 244-45. Here, in contrast, defendants allege plaintiff acted beyond the scope of his privileges by performing an "incision and drainage of the tibia or tibial osteotomy," and conducting an "osseous procedure[] to the tibia or fibula above the level of the ankle." Although the allegations against plaintiff also include claims of unprofessional conduct, those contentions are not the sole basis for the hospital's action, unlike in Nanavati.

Additionally, Nanavati discussed the standard applicable to procedures seeking termination of privileges, not a proposed restriction of privileges subject to the result of a hearing, or a temporary suspension, as here. Id. at 248. No party has identified, nor has our independent research uncovered, any case applying the Nanavati standard to such circumstances. Although the court noted

A-0436-23

plaintiff's privileges "stand to be terminated, even temporarily and non-exhaustively," we find no support for that finding in the record, as termination and suspension are distinct disciplinary actions. Indeed, defendants recommended plaintiff's privileges be reinstated subject to an FPPE.

With those distinctions in mind, we conclude the correct standard to apply at the hearing on the temporary suspension of plaintiff's privileges is that set forth in defendants' bylaws. It is undisputed that plaintiff is governed by defendants' established procedures provided by its bylaws. As the Court explained in Nanavati, a hospital's established procedures for making privilege-related decisions are entitled to our deference. Id. at 250-51. Nothing in the record before us suggests the burden of proof in the bylaws would be fundamentally unfair or otherwise undeserving of that deference. See Hurwitz, 438 N.J. Super. at 296-97.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION